PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE:  FORD MOTOR CO. SPARK PLUG AND 3-VALVE ENGINE PRODUCTS LIABILITY LITIGATION | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CASE NO.  1:12-md-2316
(MDL Docket No. 2316)

JUDGE BENITA Y. PEARSON

**MEMORANDUM OF OPINION AND ORDER**
[Resolving ECF No. 42]

I.      Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.     Stipulated Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        A.      Plaintiff William Anz . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        B.      Plaintiffs Debra and Larry Black . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        C.      Plaintiff Joshua Brewer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        D.      Plaintiff Buckeye Management Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        E.      Plaintiff East Texas Poultry Supply . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        F.      Plaintiff Richard Engelman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        G.      Plaintiff William Ernestburg . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        H.      Plaintiff Rolland Garber . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        I.      Plaintiff Frank Jares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        J.      Plaintiff Mark Jennings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        K.      Plaintiff Kevin Kinch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

(1:12-md-2316)

    L.    Plaintiff Bill Kmet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    M.    Plaintiff Bela Kogler . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    N.    Plaintiff Charles Kolinek . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    O.    Plaintiff Ryan Luke . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    P.    Plaintiffs Daniel Perko and Precast Services . . . . . . . . . . . . . . . . . . . . . . . . . 40

    Q.    Plaintiff Barbara Pignato . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    R.    Plaintiff W. Timothy Sondgerath . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    S.    Plaintiff Rodney Wall . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    T.    Plaintiff Alan Weisberg . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    U.    Additional Stipulated Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

    V.    Cases filed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

III.   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

IV.    Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    A.    Consumer Fraud/Misrepresentation Claims of All Plaintiffs . . . . . . . . . . . . . . 54

    B.    Consumer Fraud/Omission Claims of All Plaintiffs . . . . . . . . . . . . . . . . . . . . . 55

        1.    Whether Ford has an obligation to disclose all of the specific
        defects that might occur after the warranty expires . . . . . . . . . . . . . . . . . . . . . . 55

            a.    New Jersey authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

            b.    Remaining states . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

        2.    Whether Plaintiffs have proven that any loss was caused by the
        alleged omission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

            a.    Whether Plaintiffs can show that they would not have
            purchased their vehicles if they had known of the alleged defect . . . . . . 65

(1:12-md-2316)

             b.      Whether some Plaintiffs who received no communication from Ford can proof causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

      3.      Purchasers of used vehicles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

      4.      Florida and Ohio Plaintiffs whose claims may be barred by the statute of limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

C.      Express Warranty Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

      1.      New Vehicle Limited Warranty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

             a.      Repair and replace warranties . . . . . . . . . . . . . . . . . . .. . . . . . . . . 73

             b.      Whether the express warranty period is unconscionable . . . . . . . 77

             c.      Equitable estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

      2.      Scheduled Maintenance Guide . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

             a.      Whether Plaintiffs saw or read the Scheduled Maintenance Guide . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

             b.      New Vehicle Limited Warranty . . . . . . . . . . . . . . . . . . . . . . . . . 83

             c.      Plaintiffs who had their spark plugs changed before 100,000 miles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

      3.      Extended Warranties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

      4.      Plaintiffs who failed to give notice of breach as required by state law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

D.      New Jersey Plaintiffs Garber and Weisberg's Breach of Duty of Good Faith and Fair Dealing Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

      1.      Whether Plaintiffs Garber and Weisberg entered into a contract of sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

      2.      Breach of implied covenant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

(1:12-md-2316)

    E.     Tort Claims of All Ohio Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

         1.     Ohio Commercial Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

         2.     Ohio Non-Commercial Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

         3.     Whether the Non-Commercial Plaintiffs' Vehicles Were Unfit for Their Intended Purpose or Unmerchantable . . . . . . . . . . . . . . . . . . . . . 90

         4.     Plaintiff Perko's Negligence Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

    F.     Plaintiffs Who Cannot Show That They Have Suffered Any Loss . . . . . . . . . . 93

         1.     "Diminution in value" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

             a.     Whether Plaintiffs can show "diminution in value" damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

             b.     Plaintiffs who sold or traded in their vehicles . . . . . . . . . . . . . . 95

         2.     Whether Plaintiffs can show that they paid "excessive monies" for spark plug replacements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

             a.     Plaintiffs Perko and Precast Services (Vehicles 79, 81, and 90) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

             b.     Plaintiffs Precast Services (Vehicles 83, 87, 88, 91, and 92), Kinch, Engelman, and Kolinek . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

             c.     Plaintiffs Precast Services (Vehicles 78 and 80), Kmet, Sondgerath, Pignato, Weisberg, and Debra and Larry Black . . . . . . . . . . 98

             d.     Plaintiffs Buckeye Management Group, Jennings, Kogler, Garber, Ernestburg, East Texas Poultry Supply, Jares, Luke, Anz, Wall, Brewer, and Precast Services (Vehicle 62) . . . . . . . . . . . . . . . . . 98

         3.     Whether Plaintiffs can show that they paid "excessive monies" for maintenance and repair . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

V.     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

(1:12-md-2316)

Pending is Ford's Motion for Summary Judgment (ECF No. 42).  Ford moves the Court for summary judgment in its favor on all claims and against 22 named Plaintiffs (Buckeye Management Group, LLC, d/b/a Fleet Doctor, Mark Jennings, Precast Services, Daniel Perko, Kevin Kinch, Ryan Luke, Tim Sondgerath, Richard Engelman, Barbara Pignato, Debra Black, Larry Black, Bill Kmet, Bela Kogler, Rolland Garber, Alan Weisberg, William Ernestburg, East Texas Poultry Supply, Frank Jares, Bill Anz, Charles Kolinek, Rodney Wall, and Josh Brewer ("Plaintiffs")) from six bellwether/exemplar states[1] whom bring multiple claims relating to 35 vehicles.  In the alternative, Ford moves the Court for partial summary judgment against all or some of these Plaintiffs on all or some claims.  The Court has been advised, having reviewed the record, including the stipulated facts, the parties' briefs, and the applicable law.  The Court has also considered the oral arguments of counsel offered during the motion hearing held on the record.  For the reasons provided below, Ford's motion is granted, in part, and denied, in part.

## I.  Overview

This case is a potential putative class action brought to remedy alleged violations of law in connection with Ford's sale or lease of more than two million vehicles that allegedly contain defective spark plugs and related engine defects in certain three-valve engines.  Plaintiffs allege that the defects cause consumers to pay considerably more for spark plug replacements then they would have absent the defect.

Plaintiffs are not claiming that the spark plug itself did not function as intended.  Rather, according to Plaintiffs, the vehicles utilize unconventional, multi-piece spark plugs in which the

---

[1] Florida, Illinois, Michigan, Ohio, New Jersey, and Texas.  *See* ECF No. 32.

(1:12-md-2316)

"ground electrode shield" (the bottom part of the plug) is a separate piece crimped (the metal is pinched) to the remainder of the plug.[2]  Once each vehicle is started, unburned hydrocarbons are forced into a gap between the ground electrode shield and the engine's cylinder head as a result of the design defect.  These hydrocarbons then condense against the cooler cylinder head walls and form asphalt-like carbon deposits which lock or seal the plugs in place.  Ford acknowledges that these deposits affect the plugs at no later than 10,000 miles (well within the warranty period).  *See also* ECF No. 48-3 (Ford 6-Sigma presentation documenting breakage as early as 10,000 miles).  When an owner or mechanic attempts to remove one of these spark plugs using normal techniques, the ground electrode shield often breaks away from its crimp, leaving a portion of the plug stuck in the cylinder head.[3]  Specially designed tools are then needed to remove the broken partial plugs.

---

[2] ECF No. 48-2 is a drawing of Ford's multi-piece spark plug.  This was referred to at the oral motion hearing as the 2006 spark plug.  *See* ECF No. 72 at PageID #: 5018.  The 2006 spark plug is a high thread plug, meaning that the threads of the plug are much higher up on the plug in relation to the bottom of the plug or the electrode.  The spark plug at issue is much longer than the 2003 spark plug.  The bottom piece, called the ground electrode shield, also does not exist on the 2003 spark plug.  It was added to the 5.4 liter three-valve engine for the 2004 model year.

Ford introduced a new spark plug in 2009, which has much less space for the carbon to accumulate.  Unlike the 2006 plug, the 2009 plug does not have a long electrode shield.  Ford also changed the cylinder head in the engine so that the gap into which the carbon was deposited was no longer an issue.

[3] This is referenced in the Technical Service Bulletins ("TSBs") as failure mode: (1) (the electrode is stuck), (2) (in addition to the electrode, part of the porcelain piece is stuck) or (3) (the electrode is stuck, part of the porcelain is stuck, and the porcelain breaks).  *See* ECF Nos. 48-35, 48-36, and 48-37.

6

(1:12-md-2316)

Plaintiffs also complain about how difficult, time-consuming, and, as a result, expensive it is to remove these plugs, even when you follow the Technical Service Bulletins, and even when no plugs break.

Ford employees acknowledged that the alleged defect turned "[a] procedure that has been simple for over 100 years" (ECF No. 48-4 at PageID #: 3224) into a "disaster" or "ugly problem" (ECF No. 48-5 at PageID #: 3226-27) that "is now causing cylinder head removal and . . . engine replacement." (ECF No. 48-4 at PageID #: 3224). Ford knew that its customers were unhappy paying, on average, $1,700 per repair because of the defect. ECF No. 48-6 at PageID #: 3229. Furthermore, many absent class members had similar bills, some paying over $5,000. *See* ECF No. 48-7 (Compilation of Declarations of 58 Absent Class Members). Plaintiff Luke was quoted $12,500 to replace his engine when a piece of spark plug fell off and went down in the engine when his 2007 F-150 was being serviced at a Ford dealership. ECF No. 42-25 at PageID #: 2339.

Although the three-valve engine containing the high thread spark plugs (ECF No. 48-2)[4] was not installed in a Ford vehicle in the United States until the 2004 model year, Ford was aware of the alleged defect as early as November 1997 during the development phase. On November 26, 1997, Honeywell, the plug manufacturer, warned James Power, Ford's "Spark Plug Champion"[5] that the high thread plugs that were being developed for Ford's new

---

[4] "High thread" refers to the location of threads on the spark plug relative to the combustion gas seal, so that the threads in "high thread" plugs are situated above the combustion gas seal. ECF No. 48-8 at PageID #: 3372, 54:23-55:11.

[5] ECF No. 48-9 at PageID #: 3431.

7

(1:12-md-2316)

three-valve engine:  "accumulate some heavy combustion deposits on the ground shield.  The

complaint was that the spark plug had to be completely removed with the socket.  The high

thread plug could not be spun out like a standard spark plug."  ECF No. 48-10 at PageID #: 3475.

Power had recommended as early as October 1999 that a lubricant known as "anti-seize"[6]

be used during the manufacturing process to coat the threads and ground shield of the spark plugs

"as a solution to removal issues."  ECF No. 48-25 at PageID #: 3559.  Ford estimated the cost to

add Loctite anti-seize at Honeywell to be 14 cents per plug (ECF No. 48-67 at PageID #: 4106),

and Honeywell's estimate was similar at 12 to 13 cents per plug (ECF No. 48-27 at PageID #:

3576), or between $0.96  and $1.12 per engine.  Ford rejected this recommendation, and

anti-seize was never used in the manufacturing process.  ECF No. 48-9 at PageID #: 3436.

According to an email message sent on July 31, 2000 from Paul Bonell, a Ford employee,

the severity of the defect was particularly troubling to Ford because "[t]he cylinder head was

designed around this new spark plug and no other [spark plug manufacturers] are as far along as

Honeywell.  If this plug doesn't make it or isn't on time, *there is no fall back plan*."  ECF No. 48-

21 at PageID #: 3548 (emphasis added).  However, even with this knowledge, Ford decided in

April 2000 to approve production of the engine with the spark plugs at issue.  A Ford employee

wrote:  "I assume you realize the 3 valve cylinder head design REQUIRES these plugs, the

company's current plan (OK'd by the Board of Directors 2 weeks ago) is to build almost 2

---

[6]  The same anti-seize that the Technical Service Bulletins subsequently required
as mandatory.  The lubricant is applied to the ground electrode shield of the replacement
spark plug where the original plug became stuck into the cylinder head.

(1:12-md-2316)

million V8/V10 engines a year with them.")."  ECF No. 48-22 at PageID #: 3550 (emphasis in original).

The same conditions that Ford encountered pre-launch persisted after the vehicles entered the market.  The first reports of a seized plug in a vehicle occurred in 2003, "only a month or two" after the vehicles were available for purchase at Ford dealerships.  ECF No. 48-8 at Page 3373.  Thereafter, Ford began paying for the removal of the spark plugs when a vehicle was brought to a dealer as a result of other warranty related issues.  The average cost per repair was $1,474 (parts and labor)."  ECF No. 48-8 at Page 3405; ECF No. 48-46 at PageID # 3782.

Altogether, the following Plaintiffs own 35 vehicles (Precast Services owns 14 vehicles, while Debra and Larry Black jointly own one).  All but four of these vehicles are F-Series trucks, and most of these are F-150s.  Fifteen of these Plaintiffs purchased their vehicles new, while seven purchased their vehicles used.

## II.  Stipulated Facts

The stipulated facts are as follows:

### A.  Plaintiff William Anz

1.  William Anz has been a resident of Texas at all relevant times. (4:12-15.[7])  He has been a firefighter for 21 years and is currently employed as an Assistant Fire Chief. (13:22-14:20.)  He is about 44 years old. (21:1-2.)

2.  Anz's father-in-law purchased a 2005 F-150 in 2005. (30:13-17)

---

[7]  All citations in this section are to the transcript of and exhibits to the October 26, 2011 deposition of William Anz (ECF No. 42-10).

(1:12-md-2316)

3.  Anz purchased the 2005 F-150 from his father-in-law in early 2009. (50:6-12.)  At that time, he believes the vehicle had been driven approximately 68,000 miles. (39:7-10.)

4.  Anz exchanged a 1999 F-150 and some cash for the 2005 F-150.  He does not know how much cash he paid his father-in-law. (7:24-8:21; 35:13-16.)

5.  When Anz purchased the 2005 F-150 from his father-in-law, it came with the remainder of an extended warranty purchased by his father-in-law. (36:1-3; 37:24-38:4.)

6.  Anz did not review the scheduled maintenance guide before purchasing his 2005 F-150. (44:10-15.)

7.  In about March 2009, Anz read about potential problems replacing spark plugs on F-150s on an F-150 online forum. (48:19-50:17.)

8.  In early 2010, Jordan Ford quoted Anz a base price of about $390 for a "major tune-up."  This price included replacement of the spark plugs if there were no problems, but the service advisor of Jordan Ford said that they were having problems with some of the spark plugs and if there was an issue with breakage the cost might come out more. (50:22-51:18.)

**B.  Plaintiffs Debra and Larry Black**

1.  Debra and Larry Black ("the Blacks") are husband and wife.  They maintain two residences, one in Illinois and one in Wisconsin. (4:8-21.[8])

2.  Mrs. Black has a bachelor's degree in education and a master's degree in reading. (D5:16-6:3.)

---

[8]  All citations in this section are to the transcripts of and exhibits to the May 10, 2011 depositions of Debra Black (ECF No. 42-11) and Larry Black (ECF No. 42-12). References to Debra Black's deposition are preceded by a D.  Other references are to Larry Black's deposition.

(1:12-md-2316)

3.  The Blacks purchased a new 2004 F-150 with a 5.4L engine from a Ford dealer in Illinois. (9:21-22; 59:14-16; 70:12-16.)

4.  The Blacks received no communications, letters, e-mails or documents (other than the materials that came with the vehicle) from Ford Motor Company relating to the 2004 F-150. (10:25-12:1.)

5.  At one time, Mr. Black owned a 1968 Mustang convertible.  He sold the vehicle because it was going to require a significant repair involving the flywheel and a repair to the roof, which was leaking, and he did not want to spend the money. (22:6-24:8. D9:19-10:4)

6.  The Blacks purchased about 17 vehicles, including the 2004 F-150. (20:7-58:4; 114:22-115:16; D9:6-22:22; D27:14-19.)

7.  Mr. Black has changed the spark plugs on approximately seven of the other sixteen vehicles that he has owned.  He decided to let a Ford dealer replace the spark plugs on the 2004 F-150 "Because I wanted to take it to Ford to have it done right before I retired.  It was like a month before I retired, so I wanted it done right with Ford parts and Ford knowledge of the vehicle and what would have to be done before I retired to have a good running vehicle when I retired." (87:11-20; 88:2-20.)

8.  On June 17, 2010, Mr. Black took the 2004 F-150 to Currie Motors, an authorized Ford dealer, for a tune-up (including spark plug replacement) and a fuel filter change.  At that time, the vehicle had been driven 101,490 miles. (90:5-14.)

9.  The Blacks complained to the Ford dealership about the cost of the spark plug replacement and associated extraction of porcelain from the cylinder. (98:5-14.)

(1:12-md-2316)

10.  As of May 10, 2011, the Blacks' 2004 F-150 had been driven 110,000 miles.
(D49:9-11.)

**C.  Plaintiff Joshua Brewer**

1.  Joshua Brewer is a resident of Texas. (4:9-10.[9])

2.  Brewer sold his 2006 Ford F-150 in about June 2012, after he joined this lawsuit as a
plaintiff. (7:8-9; 8:13-21.)  Brewer sold his truck because it had become unreliable. (161:18-21.)

3.  After selling his 2006 F-150, Brewer provided the service and warranty repair records
to the purchaser, but did keep the records corresponding to the spark plugs. (8:4-9:4.)

4.  Brewer traded his 2006 F-150 in for a 2012 Dodge Ram. (10:13-18.)  After a
negotiation, the Dodge dealer gave him $7,500 as a trade in allowance for his 2006 F-150.
(165:6-8.)

5.  At the time of his deposition, Brewer was employed as a Budget Estimator for Echo
Maintenance LLC. (11:5-12:13.)

6.  As Budget Estimator, Brewer provides estimates in repairing machinery and other
equipment and plans out existing work changes in the refinery. (13:14-22.)

7.  Brewer is responsible for estimating repairs and maintenance procedures for piping
systems. (17:21-21:1.)

8.  Brewer bought a used 2006 Ford F-150 in 2007. (50:11-20.)  At that time the vehicle
had been driven approximately 40,000 miles. (60:14-16.)

---

[9]  All citations in this section are to the transcript of and exhibits to the July 13,
2012 deposition of Joshua Brewer (ECF No. 42-13).

(1:12-md-2316)

9.   Brewer and the dealer negotiated the price of the truck, and the dealer accepted a little bit less than what the dealer was asking. (75:4-8.)

10.   Before trading in his 2003 F-150, on which he had performed nearly all of the maintenance, and purchasing his 2006 F-150, Brewer did no additional research into the maintenance histories on Ford trucks or any other brand of trucks. (51:13-21; 57:7-9.)

11.   Brewer purchased an extended warranty from Ford. (60:17-23.)  The extended warranty was for approximately 80,000 miles. (62:2-5.)

12.   Brewer has changed spark plugs in vehicles other than his 2006 F-150, including a Pontiac LeMans and a 2007 Chevrolet 1500.

13.   A year or two after he purchased his 2006 F-150, an air conditioning head unit was replaced. (78:13-79:7.)

14.   Brewer changed the oil on his 2006 F-150 every 3,000 miles. (80:5-7.)

15.   At about 130,000 miles, the O2 sensors on Mr. Brewer's 2006 F-150 were not registering correct levels, indicating to Mr. Brewer that the catalytic converter had problems. (88:15-89:9.)

16.   At about 168,000 miles, the transmission on Brewer's 2006 F-150 began to slip.  He had it rebuilt at a cost of $2,200. (102:4-21.)

17.   At about 130,000 miles the front differential went out on Brewer's 2006 F-150. (106:2-11.)  The estimated cost of repair was $1,400. (106:22-107:4.)

(1:12-md-2316)

18.  After he started experiencing performance problems with his 2006 F-150, Mr.

Brewer spoke with a friend who worked at a Ford dealership who suggested that he change the

spark plugs. Brewer changed his spark plugs at 110,000 miles.

19.  Before attempting to change his own spark plugs in April 2010, Brewer read about

problems had by others changing spark plugs.  He read that "they were having severe problems

changing out the spark plugs, that the spark plugs were having issues with breaking in multiple

different ways, and then I contacted a couple shops to find out about pricing of changing out the

spark plugs and had a couple shops tell me they wouldn't even touch the truck because of the risk

involved in changing the spark plugs" (115:5-21.)

20.  Brewer was told by two Ford dealers that they would change the spark plugs on his

vehicle for $200 in labor costs if he supplied the plugs, plus an additional charge for each plug

that broke. (116:11-117:8.)

21.  Brewer has friends who have worked as mechanics at Ford dealerships.

(133:22-134:2.)  He consulted with these friends before attempting to remove the spark plugs on

his 2006 F-150. (134:3-6.)

22.  Brewer decided to change the spark plugs himself, with the assistance of his uncle

who is an automotive mechanic. (135:21-136:15.)

23.  Brewer and his uncle used B-12 carburetor cleaner. (127:23-24.)

24.  Brewer was charged a total of $590.43 by the Ford dealership for the extraction and

replacement of the two spark plugs that had "sleeved" when he and his mechanic Uncle

attempted to remove them, and the extraction and replacement of the remaining three spark plugs

14

(1:12-md-2316)

on his vehicle, all of which broke when the Ford dealership attempted to remove them. (144:22-25.)  Mr. Brewer supplied the dealership with the OEM Motorcraft spark plugs he purchased at Autozone. (139:1-16)

25.  Brewer did brake work in his Ford trucks, including his 2006 F-150, and his Pontiac LeMans.  The cost of brake work and the time it took to perform varied from vehicle to vehicle. (152:12-153:4.)

### D.  Plaintiff Buckeye Management Group

1.  Buckeye Management Group LLC ("Buckeye") was the legal entity for a business operated under the name of The Fleet Doctor ("Fleet Doctor"). (6:1-3.[10])

2.  David Evans was and is the only member of Buckeye. (5:12-19.)

3.  Evans sold the business of The Fleet Doctor on October 1, 2011. (6:15-7:3.)

4.  As of the date of Evans' deposition, Buckeye still existed as a legal entity, but it owned no assets, and had only debt. (7:4-8.)

5.  At the time of his deposition, Evans was not employed. (31:12-15.)

6.  The Fleet Doctor's business was maintenance and repair of medium and heavyduty vehicles. (33:25-34:3.)

7.  On or around September 6, 2006, Evans, on behalf of Buckeye, bought a 2006 Ford F-250 from Liberty Ford. (55:12-57:2, Dep. Ex. 3 at BUCKEYE00125.)  Buckeye traded in a Ford E-350 van, and although Buckeye had negative equity in the E-350 at the time, Evans

---

[10]  All citations in this section are to the transcript of and exhibits to the October 25, 2011 deposition of David Evans, as corporate representative of Buckeye Management Group LLC, d/b/a The Fleet Doctor, and to documents produced by Buckeye Management Group LLC (ECF No. 42-14).

(1:12-md-2316)

negotiated the price of the F-250 so that the payments Buckeye was making remained the same. (9:9-25, 57:11-16.)

     8.  The 2006 F-250 had been used as a demo by the dealership, and it had 5,075 miles on it at the time Buckeye purchased it. (57:24-58:3.)

     9.  When it purchased the 2006 F-250, Buckeye received the balance of the manufacturer's warranty that came with the 2006 F-250. (58:4-10.)

     10.  Evans chose the F-250 because he needed a vehicle that could be used as a snowplow, and because his road service worker had young children and needed a vehicle that the children could ride in. (44:11-23, 45:11-15.)

     11.  The Fleet Doctor used the 2006 F-250 for snowplowing, as well as for running parts and periodic service calls. (21:1-3.)  The 2006 F-250 was used solely for the business of The Fleet Doctor. (21:4-6.)

     12.  For work done by Fleet Doctor's mechanics on the 2006 F-250, Fleet Doctor billed itself at a rate at least $40 per hour less than it would bill external customers. (41:21-42:8, 98:10-14.)  Fleet Doctor's typical billing rates for external customers usually ranged from $55 to $95 per hour. (98:10-17.)  Fleet Doctor billed itself at cost for parts used on the F-250. (42:13-16.)

     13.  The spark plugs in Fleet Doctor's 2006 F-250 were changed in March or April 2009, because one of Fleet Doctor's mechanics told Evans it was time to change the plugs. (93:13-22, 96:12-14, 97:4-19, Dep. Exs. 20-21.)  The mileage of the 2006 F-250 was not recorded at the time of the spark plug change. (94:21-24, Dep. Exs. 20-21.)

16

(1:12-md-2316)

14.  According to one of the invoices pertaining to the spark plug change, Fleet Doctor charged itself $12.96 for each spark plug part, for a total of $103.68. (95:23-96:7, Dep. Ex. 21.)

15.  According to one of the invoices pertaining to the spark plug change, Buckeye charged itself $1,853.68 for 26.5 hours of labor for the spark plug change, at a rate of $69.95 per hour. (97:24-98:2, Dep. Ex 21.)

16.  All eight spark plugs broke during the spark plug change on the F-250.  The mechanics obtained a special tool and were able to remove all eight spark plugs without damaging the engine in the 2006 F-250. (106:5-17.)

17.  In June 2009, the alternator was replaced in the 2006 F-250 and troubleshooting regarding an intermittent gauge loss was performed, at a cost of $370.74.  The mileage on the F-250 at the time of that repair was 79,074. (BUCKEYE00051.)

18.  In early December 2010, the 2006 F-250 was stolen. (18:5-8.)  The vehicle was missing for around a month.  When it was found, the snowplow had been stolen off the vehicle, and the vehicle was damaged, requiring $9,100 in repairs. (18:19-19:12, BUCKEYE00126-128.)

19.  In spring 2011, Evans, on behalf of Buckeye, sold the 2006 F-250 back to Liberty Ford.  At the time, Buckeye still owed around $7,000 on the vehicle, and Buckeye received around $2,000 from Liberty Ford in the transaction. (10:16-22.)  The 2006 F-250 had more than 123,000 miles on it at the time Buckeye sold it. (17:1-3, BUCKEYE00130.)

20.  Evans believes a tune-up on a vehicle comparable to the 2006 F-250 would cost between $250 and $300 and that the cost to remove and replace spark plugs in a comparable vehicle would be in the realm of $200. (129:3-14.)

17

(1:12-md-2316)

**E. Plaintiff East Texas Poultry Supply**

1.  HHH Farms is a Texas corporation that is registered as HHH Farms, Inc. d/b/a East Texas Poultry Supply (hereinafter "ETPS"). (17:14-18.[11])

2.  ETPS is owned by two shareholders: William Howell Howard and his wife, Pam. (6:9-19.)

3.  Howard is the president of ETPS. (7:15-16.)

4.  On behalf of ETPS, Howard purchased a new 2006 F-150 for his son to drive. (72:5-7; 127:2-6.)

5.  The 2006 F-150 came with Ford's New Vehicle Limited Warranty. (78:1-2; Dep. Ex. 2 at ETPS00041-58.)

6.  Howard did not purchase an extended warranty for the 2006 F-150. (83:10-12.)

7.  Howard sold the 2006 F-150 to Antonio Espinosa, who is an employee of HHH Farms for $1.00. (91:10-22; 93:20-23.)

8.  After selling the vehicle to Espinosa, ETPS has continued to pay for all maintenance on the 2006 F-150 and Espinosa uses the vehicle in his work for HHH Farms. (117:1-6.)

9.  ETPS sold the vehicle to Espinosa some time prior to June 1, 2011. (93:11-94:4.)

10.  Espinosa had been driving the F-150 for "a couple of years" before ETPS sold the vehicle to him. (94:13-19.)

---

[11]  All citations in this section are to the transcript of and exhibits to the October 25, 2011 deposition of William H. Howard as corporate representative of East Texas Poultry Supply (ECF No. 42-15).

(1:12-md-2316)

11.  In May 2011, Espinosa told Howard that the service light was on in the 2006 F-150 and Howard told him to take the vehicle to Center Motor Company for service. (103:4-20.)

12.  Howard does not know how many miles were on the vehicle at the time of the spark plug replacement because the odometer was broken. (106:16-107:8)

13.  Seven spark plugs broke when the dealership tried to remove them. (110:16-20.)

**F.  Plaintiff Richard Engelman**

1.  At all relevant times, Richard Engelman has been a resident of Illinois. (4:15-17.[12])

2.  Engelman purchased a new 2006 Ford F-150 in March 2007 from Court Street Ford, Inc. in Bourbonnais, Illinois. (54:23-55:2; 72:9-12.)

3.  Engelman's vehicle came with Ford's New Vehicle Limited Warranty. (82:13-83:1; Ex. 13.) Engelman also purchased a PremiumCARE Extended Service Plan (also known as an extended warranty).  He paid $1,420 for this extended warranty. (73:3-5; 85:24-88:2.)  The duration of the extended warranty was 72 months or 75,000 miles, whichever came first. (88:23-89:5; Ex. 14.)

4.  Engelman negotiated the price of the vehicle with the dealer, and the dealer offered to reduce the sticker price by approximately $8,700 which appears as a rebate on the Buyers Order. (74:16-20.)

5.  Prior to purchasing the 2006 F-150, Engelman owned a 2002 Explorer. (54:18-25.) He drove the Explorer for about 70,000 miles before trading it in when he purchased the 2006 F-150. Engelman received $5,000 for the trade in. (55:3-9; 73:24-74:12.)

_____

[12]  All citations in this section are to the transcript of and exhibits to the November 14, 2011 deposition of Richard Engelman (ECF No. 42-16).

(1:12-md-2316)

 6. Before the Explorer, Engelman owned a 1998 or 1999 Chevy Blazer. (57:8-13.)  When Engelman traded the Blazer in to buy the Explorer, the Blazer, had about 65,000 miles on the odometer. (58:3-59:6; 58:24-25.)

 7. Engelman initially did his own routine maintenance on his vehicles.  By the time he bought his 2002 Explorer, he had stopped doing routine maintenance on his vehicles himself and had it done by a Ford dealer. (55:10-21.)

 8. Engelman read through his extended warranty when he purchased his vehicle. (14:2-6; 15:19-16:10.)

 9. Engelman did not see, receive or read the Owner's Guide or the scheduled maintenance guide before he purchased his vehicle. (14:21-15:2.)

 10. Engelman graduated from high school in 1965. (21:8-18.)  He worked mainly as a truck driver until 2001, when he retired. (21:19-28:19.)  After retirement he worked part time for a farmer driving a tractor, plowing, and doing other odd jobs. (29:2-10.)  After that, he took a job driving a school bus. (29:18-30:6.) He also worked as a part-time custodian from 2003-2011. (30:20-24.)

 11. In January 2011, Engelman's dealer told him that Ford recommended that he have his spark plugs changed at 60,000 miles instead of the 100,000 miles contained in Ford's scheduled maintenance guide. (126:6-12.)  Engelman approved replacement of his vehicle's spark plugs at 62,065, while the vehicle was in the shop for other repairs. (123:11-127:20.)

 12. Engelman was charged a total of $202.17 for the spark plugs. (137:1-3; Dep. Ex. 22).

(1:12-md-2316)

13.  Engelman was charged $237.95 for labor required to change the spark plugs. (137:7-11; Dep. Ex. 22.).  The Ford dealer also waived a $100 charge for removing the broken plug. (129:9-13).

14.  When he was deposed on November 14, 2011, Engelman's vehicle had about 75,000 miles on the odometer. (138:18-20.)

15.  Engelman has not tried to sell his vehicle. (139:6-13.)  Engelman complained to the Ford dealership about the problems related to the spark plug removal for his 2006 F-150.

16.  Engelman, who used to change spark plugs, thought that replacement of the spark plugs would cost about $150 ($64 for parts and about $90 for labor). (156:10-157:19)

**G.  Plaintiff William Ernestburg**

1.  At all relevant times, William Ernestburg has been a resident of New Jersey.

2.  Ernestburg was born in 1959. (7:14-15.[13])

3.  Ernestburg joined the Coast Guard in 1986. (12:17-18.) Ernestburg received training in aviation maintenance in the Coast Guard from 1986 until 2009, and his job responsibilities included maintaining Coast Guard aircraft. (12:21-14:22.)

4.  While working in aviation maintenance for the Coast Guard, Ernestburg would use "maintenance procedure cards," which provided instructions on how to properly maintain and repair the various aircraft. (16:14-25.)

---

[13]  All citations in this section are to the transcript of and exhibits to the May 23, 2011 deposition of William Ernestburg (ECF No. 42-17).

(1:12-md-2316)

5.  On November 22, 2006, Ernestburg purchased a used 2004 Ford F-150 from Chapman Ford in Egg Harbor Township, New Jersey. (46:11-16; Ex. 1, at ERNEST000266.)  At the time of purchase, the vehicle had 38,673 miles on it. (64:1-3.)

6.  While Ernestburg was at Chapman Ford on November 22, 2006, he saw a 2004 F-150 that he liked because of its appearance and because it was roomier and more powerful than his Ranger. (62:15-24.)  He decided to trade in his Ranger and purchase the F-150, completed the process in approximately two to three hours, and drove off the lot in the F-150. (61:21-23.)

7.  In May 2010, Ernestburg took his F-150 to Chapman Ford to have the spark plugs replaced. (124:20-125:1, 126:2-6; Ex. 27.)  At that point, the truck was six years old and had been driven for 102,195 miles. (125:2-3.)

8.  Ernestburg was not having any problems with his vehicle when he decided to have the spark plugs replaced, but he took it in for service because Ford recommended replacing the spark plugs at 100,000 miles. (126:18-127:3.)

**H.  Plaintiff Rolland Garber**

1.  At all relevant times, Rolland Garber has been a resident of New Jersey. (6:9-13.[14])

2.  Garber was born on August 3, 1942. (6:14-15.)

3.  Garber retired in 1999 after working for more than 30 years as a union electrician installing wiring in commercial buildings. ( 20:14-23:8.)

4.  Garber learned to work on vehicles by working in his uncle's service station starting at the age of 14. (11:23-12:17.)

---

[14]  All citations in this section are to the transcript of and exhibits to the March 6, 2012 deposition of Rolland Garber (ECF No. 42-18).

(1:12-md-2316)

5.  After he graduated from high school, Garber joined the Navy as a boilerman second class, where he was responsible for operating and maintaining the boilers on Navy destroyers. (12:15-13:4.)

6.  After leaving the Navy, Garber was employed as an automotive mechanic by Winter's Ford in New Jersey, where he mostly performed warranty repairs. (11:11-14.)

7.  After leaving Winter's Ford, Garber worked at Sealtest Foods maintaining dairy equipment and milk packaging machinery. (15:18-25.)

8.  Garber purchased a new 2005 Ford F-150 on September 6, 2005 at Holman Ford in Glassboro, New Jersey. (50:7-23.)

9.  Garber wanted a truck with a heavy tow package because he was in the process of purchasing a camping trailer and needed a vehicle that was able to tow it. (51:16-52:14.)  He also wanted the upgraded XLT package and four wheel drive. (52:22-25.)

10.  The Scheduled Maintenance Guide was in the vehicle when Garber took delivery of his 2005 F-150. (83:24-84:9.)

11.  Garber first read the Scheduled Maintenance Guide at home after he had purchased the 2005 F-150. (84:13-23.)

12.  Garber was "very happy" with his experience at Holman Ford and did not feel any pressure "at all" to purchase the F-150. (77:1-8.)

13.  Every winter during the time that Garber owned his F-150, he would use the vehicle to tow his camping trailer to the West coast or to Florida from his home in New Jersey. (92:1-10, 98:5-10, 102:19-23, 109:15-110:9.)

23

(1:12-md-2316)

14.  On May 27, 2010, Garber took his F-150 to an independent repair shop in New Jersey (DeAngelis Auto Repair) to check his engine, which was acting up in his view and had developed a vibration or little shake. (131:4-20.)  At that time, the truck had 95,283 miles on it and while Garber understood it was "still early," he told DeAngelis to do the scheduled 100,000 mile maintenance and to replace the spark plugs while he was there. (131:25-132:23.)

15.  During the five days between the service work at DeAngelis and taking his vehicle to Echelon Ford, Garber was able to drive his vehicle and "[i]t ran fine," except for "[a] little bit of vibration." (141:1-8.)

16.  Three spark plugs broke when Echelon Ford tried to remove them. (142:25-143:3; Ex. 27.)

17.  Garber is familiar with Technical Service Bulletins ("TSBs") from his time working as an automotive mechanic. (135:10-22.)

18.  When Garber was working as a mechanic, if a TSB had been issued for a vehicle he was working on, he would follow the procedure in the TSB. (135:23-25.)

19.  In May 2011, when Garber's 2005 F-150 had approximately 115,000 miles on it, he decided to trade it in for a 2011 Ford F-150. (166:21-25, 180:21-181:1.)

**I.  Plaintiff Frank Jares**

1.  At all relevant times, Jares has been a resident of Texas. (4:13-15.[15])

2.  In September 2004, Jares purchased a new 2004 F-150 from Mac Haik Ford in Houston, Texas for the price of $36,642. (7:25-8:16; 106:24-107:1; Ex. 2 at JARES00021-24.)

---

[15]  All citations in this section are to the transcript of and exhibits to the October 26, 2011 deposition of Frank Jares (ECF No. 42-19).

(1:12-md-2316)

3.  Prior to purchasing the 2004 F-150, Jares did some "basic" research about the vehicle on the Internet. (49:17-24.)

4.  Jares' 2004 F-150 came with a New Vehicle Limited Warranty. (51:14-15; Ex. 2 at JARES00196-00213.)

5.  Jares did not purchase an extended warranty for his 2004 F-150. (51:18-19.)

6.  Jares thought he would keep the 2004 F-150 for approximately 90,000 miles and then get a new vehicle. (55:4-7.)

7.  Prior to having the spark plugs replaced, Jares "had read extensively on the Internet" that replacing the spark plugs could be $1,400 to $2,400. (78:19-79:10.)

8.  Jares does not remember, but thinks between four and six spark plugs broke when Sevcik's attempted to remove them. (82:12-14.)  Jares was told that Sevcik's determined that it was necessary to remove the cylinder heads in order to complete the spark plug replacement. (81:15-21.)

9.  Excluding the cost of service on the front differential, which was not related to the spark plug service, Jares paid $2509.82 to replace the spark plugs. (75:21-76:2; Ex. 2 at JARES00008.)

10.  It took "four, maybe five, days" for Sevcik's to complete the spark plug service. (103:5-8.)

11.  As of October 2011, Jares had approximately 130,000 miles on his 2004 F-150. (62:14-18.)

(1:12-md-2316)

### J. Plaintiff Mark Jennings

1.  At all relevant times, Mark Jennings has been a resident of Ohio.

2.  Jennings is the Vice President of Quality Construction Management, Inc. ("QCM"), a company owned by Jennings' wife and two other individuals. (6:19-10:20.[16])  QCM does roadway, bridge, and highway inspection, as well as construction layout and property surveys. (10:10-13.) Jennings is the vice president of QCM and schedules projects, puts bids together, and does inspections for QCM. (10:14-20.)

3.  Jennings' wife also owns half of a company called National Railroad Safety Services, Inc. ("NRSS"), which is in the business of railroad flagging.  Jennings occasionally oversees day-to-day and week-to-week work for NRSS, and occasionally goes out on jobs and flags. (6:22-9:21.)

4.  Jennings studied auto mechanics at Northern Kentucky Vocational School. (21:14-24.)

5.  Jennings bought a 2005 F-150 because "he liked the look" of the vehicle. (46:17-18.)

6.  On or around September 6, 2006, Jennings traded in his 2005 Ford F-150 for a 2006 King Ranch Ford F-150 with a 5.4L three-valve engine at Mt. Orab Ford in Mt. Orab, Ohio. (49:16-50:1.)

7.  Jennings did not read any literature on the 2006 F-150 before he purchased it. (67:4-6.)

8.  Jennings' 2006 Ford F-150 came with Ford's New Vehicle Limited Warranty. (Dep. Ex. 4.)

---

[16]  All citations in this section are to the transcript of and exhibits to the October 25, 2011 deposition of Mark Jennings (ECF No. 42-20), and to documents produced by Mr. Jennings.

(1:12-md-2316)

9.  Jennings purchased a PremiumCARE service contract on the 2006 F-150, also known as an extended warranty. (74:17-20, Dep. Exs. 5 and 13.)  He paid $1,697.33 for this extended warranty. (83:13-14, Dep. Ex. 13.)  The time and mileage limits contained in the extended warranty were five years or 100,000 miles, whichever came first, and it had a $100 deductible. (83:1-12, Dep. Ex. 13.)  Jennings was unsure whether he ever received a copy of the extended warranty. (76:6-77:19.)

10.  Jennings did not read the Tire Warranty, the "Safety Advice" card, or the "Driving Your SUV or Truck" manual that came with his 2006 F-150. (78:11-24, 79:20-80:5, 80:21-1.)

11.  Jennings had an ignition coil replaced at 47,422 miles at no charge. (98:11-24, Dep. Ex. 20.)  Also, check engine lights were diagnosed, the engine variable timing solenoid was replaced, and the air conditioning system was repaired under warranty. (97:4-98:9, Dep. Exs. 16, 19.)

12.  In September 2010 at around 94,214 miles, Jennings' 2006 F-150 began "running bad," in that the engine was "missing" and gas mileage was "falling off." (113:7-114:1.)  A damaged vacuum hose to the front hubs was replaced under warranty, as was a front vacuum solenoid. (Dep. Ex. 20.)  Jennings was told that the spark plugs were misfiring and needed to be replaced.

13.  Jennings was later told that all eight plugs broke during the tune-up and he would have to pay for an hour of additional labor time for each broken plug. (117:10-13.)  Jennings was ultimately charged $1112.50 for labor for the tune-up and spark plug change.  A valve assembly was also replaced. (Dep. Ex. 35.)

(1:12-md-2316)

14.  Jennings was charged $20.08 per spark plug. (117:15-18.)

15.  After the spark plug change in Jennings' 2006 F-150, Jennings took a 2006 F-150 owned by his wife's company NRSS to Tire Discounters for a spark plug change. (125:6-24.) Tire Discounters told Jennings the charge would be $200-300 for the tune-up, plus an additional half hour of labor time per broken spark plug. (133:4-135:4.)  The ultimate charge for the spark plug change on that vehicle was $600. (125:6-13, 126:7-9.)  Eight plugs were broken during that spark plug change as well. (126:24-127:5.)

16.  On April 25, 2011, at 106,535 miles, Jennings paid $371.45 to replace the driver fuel pump module. (140:11-21, Dep. Ex. 39.)

17.  At the time of his deposition, Jennings had approximately 120,000 miles on his 2006 F-150. (60:24-61:1.)

**K.  Plaintiff Kevin Kinch**

1.  Kinch is originally from Canada, but he moved to the United States in 1998. (16:22-17:6.[17])  At all relevant times, Kinch has been a resident of Ohio.

2.  Kinch was born on September 30, 1963. (5:19-20.)

3.  Plaintiff Daniel Perko is Plaintiff Kevin Kinch's brother-in-law. (16:3-4.)

4.  At the time of his deposition, Kinch had been in the business of selling hydraulic tube fittings and adaptors for more than 15 years. (18:9-20:25.)

---

[17]  All citations in this section are to the transcript of and exhibits to the February 23, 2011 deposition of Kevin Kinch (ECF No. 42-21).

(1:12-md-2316)

5.  Kinch has performed maintenance, including spark plug changes, on some of his own vehicles, but not on his 2004 F-150. (28:16-23.)  The last time he changed spark plugs in a vehicle was in 2004, on a 2002 Dodge Ram. (29:4-6, 32:22-25.)

6.  Kinch has performed minor brake repairs on his own vehicles in the past, but he has not done such work himself in recent years. (30:14-23.)

7.  At approximately 40,000 miles, Kinch replaced the spark plugs on a 1990 Mercury Cougar he bought new.  Kinch did not get a quote from a dealer to replace the spark plugs. (49:14-18.)

8.  In 1994, Kinch leased a GMC Sierra pickup truck, which he later bought after the lease expired. (50:1-16.)

9.  Kinch drove the 1994 Sierra for 150,000-160,000 miles, and replaced the spark plugs himself every 40-50,000 miles "for performance reasons." (52:23-53:12.)

10.  Kinch had to pay to have an EGR valve replaced on the 1994 Sierra. (54:5-12.)  In 2002, Kinch bought a Dodge Ram.  Even though he had no mechanical issues with it, he "hated that truck" because it "was a gas hog," and "it wasn't a nice handling, smooth riding truck." (56:17-57:21.)  The 2002 Dodge Ram got less miles per gallon than the window sticker said it would get. (58:2-17.)

11.  Kinch paid to have the suspension lowered on the 2002 Dodge Ram for esthetic purposes. (60:1-23.)

12.  Kinch had "continuous issues" with emissions on the 2002 Dodge Ram, and the problems were covered even after the warranty expired. Beginning in 2004, Kinch contemplated

29

(1:12-md-2316)

purchasing a new F-150. (67:19-21.)  He spoke to "lots of dealers" while he was considering his

purchase, and he test drove an F-150 in 2005. (67:17-69:6, 70:19-71:9.)

13.  Kinch did not buy a new F-150 in 2004 because he was contractually in a lease with

his Ram, and he could not get out of it financially. (69:4-10.)

14.  Between August and October 2005, Kinch purchased a used 2004 F-150 with a 5.4L

three-valve engine from Rick Parker, a family friend. (64:15-65:2, 94:6-95:2, 165:22-166:10.)

Kinch paid $25,000 for the 2004 F-150. (65:8-9.)  The 2004 F-150 had around 39,000 miles at

the time Kinch purchased it. (65:15-17, 100:10-13.)

15.  Before he purchased the 2004 F-150 from Mr. Parker in 2006, Kinch read what

people were saying in an online F-150 Ford forum, but he did not base his decision on the

comments he read. (72:25-73:15.)

16.  Kinch changes the oil in his 2004 F-150 once a year, or every 25,000 miles, and uses

a special synthetic oil called AMSOIL. (104:1-105:9.)

17.  In October 2009, Kinch decided to replace the spark plugs in his 2004 F-150 because

his brother-in-law, Daniel Perko, told Kinch that he was having spark plug issues with his

company trucks and his personal truck. (117:11-19.)

18.  Before he took his 2004 F-150 in for a spark plug change, Kinch visited online Ford

F-150 forums, and saw a technical service bulletin as well as people talking about changing spark

plugs in F-150s. (129:1-130:8, 166:1-6.)

(1:12-md-2316)

19.  Kinch took his 2004 F-150 to Liberty Ford for the spark plug change, because Kinch gets "treated well there now thanks to [his] brother-in-law." (119:12-17.)  Kinch was charged $9.90 per spark plug ($79.20 total) and $175 for labor for the spark plug change. (Dep. Ex. 9.)

20.  No spark plugs broke on Kinch's 2004 F-150 during the spark plug change. (Dep. Ex. 9, 131:8-12.)

21.  Kinch thought the price he was charged for the spark plug parts was too high. (125:1-6, 125:22-126:3.)

22.  Kinch paid for various repairs to his vehicle other than spark plug replacement, including repairs to the window motors on both the driver's and passenger side doors, each of which cost approximately $300. (114:23-115:24, Dep. Ex. 10.)  Kinch also paid $390.84 to replace the throttle body on his 2004 F-150. (139:25-140:18, Dep. Ex. 12.)

23.  Kinch thinks that the $175 he was charged for labor for the spark plug change was too high. Kinch thinks it should take an hour to change spark plugs, based on his past experience with other vehicles. (127:11-19.)

24.  At the time of his deposition, Kinch had approximately 117,000 miles on his 2004 F-150 and had no immediate plans to sell the vehicle, although he planned to replace the vehicle within a year. (95:15-96:1)

**L.  Plaintiff Bill Kmet**

1.  At all relevant times, Bill Kmet has been a resident of Michigan. (7:23-9:18.[18])

---

[18]  All citations in this section are to the transcript of and exhibits to the November 15, 2011 deposition of Bill Kmet (ECF No. 42-22).

(1:12-md-2316)

2.  For more than 20 years, Kmet has owned and operated a nine-hole golf course, bar and restaurant in Marlette, Michigan.  He also winterizes sprinkler systems, and occasionally works for an electrician. (8:6-10:3, 14:24-15:22.)

3.  In 1988 or 1989, Kmet bought a new 1989 Ford F-250. (89:7-8, 91:17-21.)  Kmet took that truck to a dealer for routine maintenance. (92:4-6.)  Kmet put over 100,000 miles on that F-250. (92:12-13.)  The vehicle suffered a problem with peeling paint, and Kmet had to pay for a new clutch in the truck. (93:7-94:19.)  Kmet eventually sold that F-250 and bought a used 1989 F-250, which he still owned at the time of his deposition. (95:6-96:2, 110:10-16.)

4.  In the late 1990s, Kmet and his wife owned a Pontiac Montana on which the oil pump failed. (99:10-101:4.)  Kmet sold the Montana for $800-$900. (101:5-13.)

5.  In April 2008, Kmet purchased a used 2005 Ford F-250 truck with approximately 30,647 miles on it. (41:7-42:21, 181:7-10; Dep. Ex. 3, Dep. Ex. 11 at KMET00246.)  He paid approximately $25,000 for the truck and also purchased a Ford Premium Care Extended Service Plan, also known as an extended warranty. (35: 12-18; 204:16-20.)  Kmet paid approximately $1,500 for the extended warranty. (35:8-18.)  The Ford Extended Service Plan extended warranty coverage through April 1, 2012 or 78,647 miles, whichever came first. (KMET00246)

6.  Kmet's 2005 F-250 had a build date of January 31, 2005. (Dep. Ex. 11 at KMET00246.)

7.  In buying his 2005 F-250, Kmet was looking for a truck to take on vacations, and in which his grandchildren would be safe and comfortable in the back seat. (45:9-21.)  He also was concerned about gas mileage, but he thought the back seat in the Ford Ranger was "not big

32

(1:12-md-2316)

enough for the kids." (46:11-16.)  The salesman told Kmet that the F-250 would be better for hauling a trailer. (46:17-47:1.)  Kmet's purchase was also influenced by the fact that his elderly mother liked the F-250, including the heated seats. (62:17-63:24.)

8.  Kmet did not get a CARFAX report for his 2005 F-250, but the car dealer told him the truck had been owned by the owner of a company. (58:20-60:5.)  In February 2011, when his 2005 F-250 had approximately 45,523 miles, Mr. Kmet noticed that the information center in his vehicle was displaying "very low" mileage per gallon figures (1.9 or 1.2 miles per gallon). (146:2-14, Dep. Ex. 9 at KMET00005.)  Mr. Kmet took the vehicle to Imlay City Ford for repair. (Dep. Ex. 9 at KMET00005.)

9.  The service personnel told Kmet that they had been experiencing some problems with the type of engine and spark plugs in Kmet's truck, and "strongly recommended" that Kmet change the spark plugs. (146:23-147:4.)  Kmet was given an estimate of $500 for a tune-up. (147:11-14.)  Kmet was told that the spark plug change would not be covered by his extended warranty. (147:5-9.)

10.  While at the dealership, Kmet called a local independent mechanic.  The mechanic said there is a problem with "those plugs." (147:20-148:3.)  The independent mechanic told Kmet that whenever a customer brings in a vehicle with "those plugs," he tells the customers to change them "right now," and he just changed plugs in one such vehicle at 15,000 miles. (148:1-8.)  The independent mechanic recommended that Kmet have the Ford dealer change the spark plugs.  Based upon that recommendation, Kmet had the dealer proceed with the spark plug change. (148:8-14.)

(1:12-md-2316)

11.  The cost to replace the spark plugs (including the removal of two broken plugs) was $507.12, including $207.12 for parts (8 spark plugs at $25.89 per plug), and $300 for labor. (Dep. Ex. 9 at KMET00007-8.)

12.  Kmet thought a "reasonable" cost for a tune-up would have been "about a hundred dollars." (193:22-194:7.)  Kmet's estimate includes spark plugs at "four or five bucks a piece." (194:6-11.)

13.  The Ford dealer referred Kmet to a website where Kmet read about a class action lawsuit regarding the spark plugs.

14.  As of the date of his deposition, Kmet had approximately 52,300 miles on his 2005 F-250. (48:20-21.)  At the time of the deposition, Kmet had done no research regarding the value of his 2005 F-250 although he had received a letter from a local car dealer telling him that his 2005 F-250 was worth approximately $16,500, and he should contact the dealer if he wanted to sell his 2005 F-250. (205:7-206:9.)

15.  Kmet has considered selling his 2005 F-250 because it gets low gas mileage. (208:2-13.) Kmet still owns his 2005 F-250.

**M.  Plaintiff Bela Kogler**

1.  At all relevant times, Kogler has been a resident of Michigan. (17:17-18.[19])

2.  At the time of his deposition, Kogler had worked in marketing and advertising for more than 15 years. (7:5-8:8.)

---

[19]  All citations in this section are to the transcript of and exhibits to the January 25, 2011 deposition of Bela Kogler (ECF No. 42-23).

34

(1:12-md-2316)

3.  Prior to purchasing a 2004 Ford F-150, Kogler owned a Ford Mustang and an earlier model Ford F-150, as well as a 1966 Buick Century given to him by his grandfather. (10:12-13, 14:5-8, 16:17-22.)  Kogler kept the Mustang for approximately six years and put around 50,000 miles on it. (10:18-21).  Kogler bought an extended warranty on the earlier model F-150. (19:19-22.) Kogler kept the earlier model F-150 for two or three years. (20:22-21:2.)  Kogler's other vehicles were provided by his employers. (32:23-33:5.)

4.  On or around July 30, 2004, Kogler purchased a new 2004 Ford F-150 from Huntington Ford in Rochester Hills, Michigan. (Dep. Ex. 1.)

5.  Kogler chose the F-150 because he wanted the truck bed, and he bought a crew cab because he has two kids. (37:25-38:4.)  Kogler believed the F-250 was too much for what he needed, and he rejected the Ranger because he could not fit his kids in it. (40:15-41:3.)

6.  Kogler did not consider any brand other than Ford because his father had worked for (and retired from) Ford and Kogler was therefore able to purchase vehicles under Ford's "A Plan" discount program. (39:9-25.)  Kogler also bought his Mustang and his prior F-150 under the A Plan. (39:17-20.)

7.  Two weeks elapsed between Kogler's first visit to the dealer and his purchase of the 2004 F-150. (41:7-9.)  By the time Kogler went to the dealer, he already knew he wanted an F-150. (45:4-6.)

8.  Kogler's 2004 Ford F-150 came with Ford's New Vehicle Limited Warranty. (Dep. Ex. 15.)

(1:12-md-2316)

9. Mr. Kogler purchased a PremiumCARE Extended Service Plan, also known as an extended warranty. He paid $2,270 for this extended warranty. (142:16-24; Dep. Ex. 1.) The warranty was a five-year/100,000 mile warranty. (Dep. Ex. 1.)

10. At 60,637 miles, Kogler paid $300.97 for general maintenance on his 2004 F-150. (81:6-82:2.-83:2, Dep. Ex. 9.)

11. At 71,778 miles, Kogler paid $177.32 for maintenance and repairs to his 2004 F-150, including $115 to replace a light bulb in the instrument cluster. (Dep. Ex. 11.) Kogler thought the light bulb replacement charge was high. (87:18-22.) Kogler also had numerous repairs to his 2004 F-150 performed under warranty for which he paid nothing or was only charged the $50 deductible under his extended warranty, including replacement of a fuel pump and a sensor. (Dep. Ex. 13.)

12. In September 2008, Kogler experienced what he believed was "slipping" in the transmission or engine in his 2004 F-150. (98:23-99:14, Dep. Ex. 17.) His vehicle had 94,418 miles on it at the time, and he brought it to Huntington Ford for routine maintenance and for evaluation of the "slipping" problem. (99:11-14, 115:9-22, Dep. Ex. 17.) The service personnel at the dealership told Kogler it was time to replace the spark plugs. (100:1-12.) Kogler was originally given an estimate of $850 to replace the spark plugs. (103:23-104:4.) Kogler was told that if the plugs broke, the cost could be more, and if they did not break, it could be less. (104:22-105:4.) Kogler approved a revised estimate of $961.26 for all repairs. (Dep. Ex. 17.) After the work was done, Kogler was told that "some" of the plugs had broken, and the invoice reflects five broken plugs. (105:10-13, Dep. Ex. 17.) Kogler was charged a total of $961.26 on

(1:12-md-2316)

that date, $850.67 of which was attributable to the spark plugs replacement, including $71.84 for

the spark plugs (eight plugs at $8.98 each) and $751.18 for labor. (Dep. Ex. 17.)  The throttle

body and a sensor were also replaced at no charge under warranty. (Dep. Ex. 17.)

13.  Kogler had never before paid to have spark plugs replaced in a vehicle. (105:22-24.)

14.  In December 2008, at 100,895 miles, Kogler once again took his 2004 F-150 in for

the "slipping" problem (118:17-121:21, Dep. Ex. 20.)  He ultimately paid $489.63 for

replacement of the valve assembly and the actuator assembly. (121:23-24, Dep. Ex. 20.)  Kogler

took his 2004 F-150 in yet again for the "slipping" problem in October 2009, at 119,813 miles.

He paid $634.86 for repairs including replacement of the transfer case input shaft seal and

replacement of the rear axle pinion seal and the rear pinion seal. (125:1-126:7, Dep. Ex. 21.)  Just

two months later, at 123,394 miles, Kogler paid $225.41 for replacement of the drive belt and the

battery. (126:23-127:22, Dep. Ex. 22.)

15.  In June 2010, at 135,807 miles, Kogler again had the spark plugs in his 2004 F-150

replaced at Huntington Ford to address a "misfire." (129:4-23, Dep. Ex. 23.)  On this occasion,

Kogler was charged a total of $410.32, which included $144 for plugs (8 plugs at $18 each) and

$276 for labor. (Dep. Ex. 23.)

16.  As of the date of his deposition, Kogler had just over 150,000 miles on his truck.

(132:14-15.)

(1:12-md-2316)

### N.  Plaintiff Charles Kolinek

1.  Charles Kolinek has been a resident of Texas at all relevant times. (4:11-12.[20])

2.  Kolinek purchased a used 2006 Ford Expedition from Covert Motors in April 2007. (51:10-12.)  The vehicle had about 22,000 miles on the odometer. (52:18-23.)

3.  Prior to purchasing the 2006 Expedition, Kolinek did no research as to whether there were any problems with that generation of vehicle, he read no brochures about that generation of vehicle, and he looked at no advertisements about that generation of vehicle. (51:13-52:4.)

4.  Kolinek did not see, receive, or read the Scheduled Maintenance Guide before purchasing the 2006 Expedition. (53:13-15).

5.  Prior to purchasing the 2006 Expedition, Kolinek did not inquire about how the costs of maintaining the vehicle compared to the cost of maintaining other vehicles. (53:16-19.)  In December 2010, when the 2006 Expedition had been driven about 75,000 miles, Kolinek was told by a Ford dealer that his spark plugs needed to be replaced.  According to the invoice, it looks like Kolinek was charged $474.03 for the replacement of 8 plugs ($314.08 for plugs and boots plus $159.95 for labor). (72:23-73:2 & Ex. 2 at KOLINEK00002.)  According to the invoice, it looks like he was charged an additional $120 for labor to remove some broken plugs. (73:17-20.)

6.  Kolinek and his wife owned several vehicles before he purchased his 2006 Ford Expedition.  In purchasing those vehicles, he never investigated the costs of maintenance or repairs. (13:24-48:17.)

---

[20]  All citations in this section are to the transcript of and exhibits from the October 24, 2011 deposition of Charles Kolinek (ECF No. 42-24).

(1:12-md-2316)

7.  Prior to purchasing the 2006 Expedition, Kolinek considered Chevrolet Suburbans and Tahoes. (49:25-50:9.)  He decided to purchase the 2006 Expedition because it was probably a little cheaper maybe. (50:10-13.)

8.  Kolinek's 2006 Expedition currently has about 88,000 or 89,000 miles on the odometer. (86:21-24.)  He has no plans to sell it. (90:20-23.)

9.  In the summer of 2011, Kolinek purchased a used 2001 F-150 for his son to drive. (38:3-16.)

**O.  Plaintiff Ryan Luke**

1.  Luke moved to Florida from Trinidad in approximately 2001. (14:3-11.[21])

2.  For more than 20 years, Luke has worked in the business of manufacturing, installing and servicing air conditioning units. (10:15-16:12.)

3.  On or about May 8, 2007, Luke purchased a new 2007 Ford F-150 with a 5.4L engine from Maroone Ford in Delray Beach, Florida. (Dep. Exs. 2-3.)

4.  Luke's 2007 F-150 came with Ford's New Vehicle Limited Warranty. (103:2-4.)

5.  Other than possibly changing the air filter, Luke did not perform any maintenance himself on the 2007 F-150. (42:8-12.)

6.  Whenever his 2007 F-150 required scheduled maintenance, Luke bought Ford or Motorcraft parts at cost from a friend who was the parts manager at Pompano Beach Lincoln and Ford.  After his friend passed away, Luke purchased parts from her successor. (46:4-47:25.)

---

[21]  All citations in this section are to the transcript of and exhibits to the October 18, 2011 deposition of Ryan Luke (ECF No. 42-25).

(1:12-md-2316)

Luke would then take the parts to Firestone or Maroone Ford and have their service personnel perform the necessary service. (48:10-24.)

 7. At around 28,000 miles, Luke began experiencing a vibration and a misfiring in his 2007 F-150. (58:25-59:23.)  Between 28,000 and 36,000 miles, Luke took the vehicle in once or twice for repairs, and each time, the dealer replaced a coil pack and/or one spark plug. (58:25-62:8.)  Luke is not aware of any plugs breaking during this change/these changes. (62:9-12.)  Luke was not charged for the work done under warranty. (59:5-17, 62:13-16.)

 8. After his 2007 F-150 passed the 36,000 mile mark, Luke took the vehicle in four or five more times for replacement of one spark plug and one coil pack. (62:17-63:12.)

 9. The final coil and plug replacement was performed at 79,208 miles. (Dep. Ex. 16.)

 **P.  Plaintiffs Daniel Perko and Precast Services**

 1. Daniel Perko is a resident of Ohio.

 2. Plaintiff Kevin Kinch is Perko's brother-in-law. (245:15-20.[22])

 3. Perko is a shareholder of Precast Services, and he also is the director of tools and equipment services for Precast Services. (12:8-14, 15:18-22.)

 4. After high school, Perko worked at State Fish, and then as a mechanic at The Car Barn. (228:4-20.)

 5. Perko once owned a 2004 Ford F-150 Lariat, which he sold at around 56,000 miles. Perko never had the spark plugs changed in the 2004 F-150. (82:2-24.)

---

 [22]  All citations in this section are to the transcript of and exhibits to the February 22, 2011 deposition of Daniel Perko, and to documents produced by Mr. Perko (ECF No. 42-27).

(1:12-md-2316)

6.  On or about March 25, 2006, Perko bought a new 2006 Ford Mustang GT with a 4.6 liter three-valve engine. (PKO3 000870, PKO3 000878.)

7.  Perko's 2006 Mustang came with Ford's New Vehicle Limited Warranty. (PERKO00002-19.)

8.  Perko bought an extended warranty on his 2006 Mustang. (118:22-24.)

9.  As of the time of his deposition, Perko's 2006 Mustang had approximately 10,000 miles on it. (10:11-12.)

10.  At the time of his deposition, Perko did not have any plans to sell his 2006 Mustang. (10:9-10.)

11.  At the time of his deposition, the spark plugs had not been changed in Perko's 2006 Mustang.

12.  In late 2007, Perko bought a used 2006 Lincoln Mark, with approximately 39,000 miles on it. (208:2-13.)  Perko paid $25,500 for the 2006 Lincoln Mark. (226:22-24.)  The "check engine" light kept coming on in that vehicle, and it was in the dealer 11 times for that. (209:3-14.)  In May 2009, Perko sold the 2006 Lincoln Mark to Precast Services for $21,000. (226:25-227:2, Dep. Ex. 10.)

**Q.  Plaintiff Barbara Pignato**

1.  At all relevant times, Plaintiff Barbara Pignato has been a resident of Illinois. (44:14-16.[23])

---

[23]  All citations in this section are to the transcript of and exhibits to the November 14, 2011 deposition of Barbara Pignato (ECF No. 42-28).

(1:12-md-2316)

2.  Pignato is a partial owner of a New Jersey dealership for Printers Parts, a company that manufactures replacement parts for commercial printing presses. (15:20-23, 18:18-19:1.)

3.  Printers Parts provides a 30-day warranty on their products (20:6-21:2.)

4.  Pignato owned a 1967 Camaro that she had to pay to have taken away after the engine seized. (23:3-20.)

5.  Pignato also owned a used Nissan Pulsar that she only owned for six or nine months, but in that time period, she had to replace the flywheel once at a cost of approximately $1,000. She decided to get rid of the car when the flywheel began to wear out again. (34:3-35:17)

6.  Prior to purchasing her 2006 Ford F-150, Pignato owned or leased multiple vehicles. (50:6-14, 53:13-19.)

7.  Prior to purchasing her vehicles, Pignato performs comparative price shopping against other brands, price shopping for dealers, and checks forums for customer feedback about performance of vehicles. (50:22-51:5.)

8.  On or about September 4, 2006, Pignato purchased a new 2006 Ford F-150 from Golf Mill Motor Sales in Niles, Illinois. (Dep. Ex. 8.)  Pignato negotiated with the salesperson,and she was able to get the dealer to raise the amount she was paid for her trade-in. (60:1-19.)  Pignato also negotiated on the sales price of the 2006 Ford F-150. (61:12-14.)

9.  Pignato's 2006 F-150 came with Ford's New Vehicle Limited Warranty. (Dep. Ex. 10.).

10.  Shortly after purchase, Pignato had an aftermarket high flow air filter installed on her 2006 F-150. (124:11:13.)

42

(1:12-md-2316)

11.  At 39,483 miles, Pignato purchased a Ford Premium Care extended warranty for her 2006 F-150. (70:11-14, 81:11-13, Dep. Ex. 11.)  The warranty provided an additional three years or 36,000 miles of coverage, with a $100 deductible. (81:7-19.)  She paid $2,195 for the warranty. (81:20-21.)

12.  At 58,434 miles, on December 16, 2010, Pignato took her 2006 F-150 to a dealer because the vehicle was stalling multiple times on a daily basis. (86:5-87:5, Dep. Ex. 13.)  The service technician told Pignato that, based upon his experience, the problem was caused by a carbon build-up on the underside of the spark plugs within the cylinder head, which was impacting a sensor. (87:6-23.)  A diagnostic test performed by the dealer confirmed that there was a bad sensor due to carbon build up on the underside of the spark plugs. (89:3-7.)  The technician recommended "terra clean" to "de-gunk and de-carbon the cylinders," and he also recommended changing spark plugs immediately instead of waiting to 100,000 miles and then to change the plugs every 50,000 miles thereafter instead of the 100,000 miles called for in the scheduled maintenance manual. Pignato was also warned that "more than likely," she would have to pay extra because "one, two, maybe three spark plugs were going to break." (88:2-18.)  She was given an estimate of between $300 and $1,000 for the spark plug change, depending upon how many spark plugs broke. (122:1-11.)  The mechanic also told Pignato that at least one plug will break.  Pignato did not call around to other dealers to get other estimates for the spark plug change. (122:12-15.)

13.  Pignato was ultimately charged a total of $573.47 for the spark plug replacement in her 2006 F-150, including eight plugs at $20.08 per plug, and total labor charges of $412.83,

43

(1:12-md-2316)

which included $58.98 for removal of one broken plug. (91:6-92:8, Dep. Ex. 13.)  The invoice also indicates that a "bad T/P sensor" was diagnosed and replaced. (91:3-5, Dep. Ex. 13 at PIGNATO00002.)  Pignato was also charged $184.95 for "terra clean engine de-carb," and $109.95 for cleaning the throttle body. (92:9-94:3, Dep. Ex. 13.)  The dealership's service personnel told Pignato that she should have a tune-up every 50,000 miles instead of every 100,000 miles. (88:7-10.)

14.  The repairs did not resolve the issues with Pignato's engine, however.  The "check engine" light came on just 10 days later, and the catalytic converter was replaced in January 2011 under warranty. (94:9-98:24, Dep. Exs. 14 and 15.)

15.  At the time of her deposition, Pignato had researched the value of her vehicle on Ford.com, which listed a trade-in value just shy of $19,000 for her 2006 F-150.  Pignato still owed around $7,000 on the truck at that time. (119:19-120:21.)

**R.  Plaintiff W. Timothy Sondgerath**

1.  At all relevant times, Sondgerath has been a resident of Florida. (17:24-18:4.[24])

2.  Sondgerath has been in the pest control business since 1998. (21:3-9.)

3.  Sondgerath changed spark plugs himself in many vehicles he owned, but he did not change the spark plugs in his late 1990s Pontiac Grand Prix. (51:25-52:6.)  Sondgerath also paid to replace the coil packs on that vehicle. (50:10-18.)

4.  On or about May 25, 2006, Sondgerath's company, W. Timothy Sondgerath, Inc., which is his incorporation for High Tech Pest Management, purchased a new 2006 Ford F-150

---

[24]  All citations in this section are to the transcript of and exhibits to the October 21, 2011 deposition of W. Timothy Sondgerath (ECF No. 42-29).

(1:12-md-2316)

with a 5.4L engine from Karl Flammer Ford in Tarpon Springs, Florida. (56:18-57:1, Dep. Ex. 4.) (57:2-13, Dep. Ex. 6.)  The company also paid for repairs on the vehicle. (57:14-16.)

    5.  Sondgerath's 2006 F-150 came with Ford's New Vehicle Limited Warranty. (63:10-13.)

    6.  Sondgerath purchased a 72-month/75,000 mile PremiumCARE Extended Service Plan for his 2006 F-150, also known as an extended warranty. (74:19-75:10, Dep. Ex. 13.) Sondgerath's company paid $2,010 for the extended warranty. (60:1-11.)

    7.  On February 22, 2010, when his 2006 F-150 had 33,083 miles, Sondgerath was told by service personnel at Karl Flammer Ford that he should have the spark plugs changed in his 2006 F-150, and he received an estimate of $150 for the work if no plugs broke during the removal process. (89:9-90:20, Dep. Ex. 15.)  Sondgerath was told that if he brought the vehicle in for a spark plug change before 40,000 miles, the service personnel at the dealership believed they should be able to remove the plugs without using a special tool. (101:2-9.)  Sondgerath was told it would cost an additional estimated $100 per broken spark plug, if any broke. (90:21-24.)

    8.  Sondgerath brought his 2006 F-150 in for a tune-up on September 28, 2010, at 35,857 miles. (98:4-14.)  The invoice states that six plugs broke during the change. (Dep. Ex. 18.) Sondgerath was charged $516.88 for the tune-up, which included eight spark plugs at $18 per plug and $330 in labor charges. (Dep. Ex. 18.)

    9.  At the time of his deposition, Sondgerath had done no research regarding the value of his 2006 F-150. (113:20-22, 114:19-21.)

(1:12-md-2316)

10.  At the time of his deposition, Sondgerath's 2006 F-150 had approximately 45,000 miles on it. (120:15-18.)

**S. Plaintiff Rodney Wall**

1.  At all relevant times, Wall has been a resident of Texas.

2.  On April 4, 2008, Wall purchased a used 2006 Ford F-150 from CarMax in Austin, Texas for $25,699.56. (67:18-19, 74:23-75:1, 75:18-19; Dep. Ex. 2 at WALL00294.[25])

3.  The 2006 F-150 had 31,834 miles on it at the time of purchase. (75:12-14; Dep. Ex. 2 at WALL00294.)

4.  Wall obtained a CARFAX report before he purchased his 2006 F-150. (68:22-69:2.)

5.  During the time that Wall worked for Coastal Valve, the company reimbursed him for the use of his F-150. (67:6-8.)  Coastal Valve generally would reimburse Wall for tires, batteries, oil changes, and fuel, and would pay half of the cost of "what they call major repairs" for his F-150. (82:5-20, 85:18-24.)

6.  Coastal Valve reimbursed Wall for $225.80 of the 50,000 miles service on his 2006 F-150. (83:6-84:15.)

7.  Wall tows his 22-foot motor boat with his F-150 approximately two times per month. (72:10-20.)

8.  Wall took his F-150 to A+ Automotive because it is the repair shop that Coastal Valve uses for all of its company trucks, and because the truck was "missing."  He was told by the A+ Automotive mechanic that the spark plugs should be replaced. (104:14-105:15.)

---

[25]  All citations in this section are to the transcript of and exhibits to the October 24, 2011 deposition of Rodney Wall (ECF No. 42-30).

(1:12-md-2316)

9.  A+ Automotive ordered the special tool and Wall brought his F-150 in to have the spark plugs replaced. (106:18-21.)  At that time, the vehicle had 129,255 miles on it. (108:13-15.)

10.  Wall was charged $1225.00 for labor and $391.28 for parts for the spark plug service. (Dep. Ex. 2 at WALL00029.)  With tax, the total charge for the service was $1,649.58. (114:25-115:1; Dep. Ex. 2 at WALL00029.)  Coastal Valve reimbursed Wall $824.79, which represented half of the total cost of the spark plug service. (115:2-4; Dep. Ex. 2 at WALL00029.)

11.  As of October 2011, Wall had approximately 156,000 miles on his F-150. (73:6-9.)

12.  Wall still owns his 2006 F-150 and has no plans to sell it "anytime soon." (135:6-11.)

**T.  Plaintiff Alan Weisberg**

1.  At all relevant times, Weisberg was a resident of New Jersey.

2.  Weisberg was born on February 28, 1941. (5:12-13.[26])

3.  Weisberg purchased a 2007 Ford Expedition on October 27, 2006 from Park Avenue Ford in Tenafly, New Jersey. (52:4-20; Ex. 5.)

4.  Weisberg paid $45,089.66 for his 2007 Ford Expedition. (53:2-5; Ex. 5.)

5.  Weisberg received a Scheduled Maintenance Guide for the 2007 Ford Expedition at the time of purchase.

6.  Before purchasing the 2007 Ford Expedition, Weisberg did research on the vehicle's towing capacity. (62:20-21.)

---

[26]  All citations in this section are to the transcript of and exhibits to the June 25, 2012 deposition of Alan Weisberg (ECF No. 42-31).

(1:12-md-2316)

7. At the time he purchased the Extended Service Plan, Weisberg received a "National Provisions Booklet." (68:12-69:3; Ex. 13.)

8. Weisberg received the document attached as Exhibit 14 to his deposition. (75:5-21; Ex. 14.)

9. In August 2010, Weisberg decided to have the spark plugs replaced in his 2007 Expedition at approximately 65,000 miles. Weisberg took his 2007 Expedition to ETD Discount Tire Centers, Inc. and asked them to replace the spark plugs. (84:12-85:8.)

10. ETD removed one spark plug without any problem, but the second spark plug they attempted to remove broke and a piece remained stuck in the engine. (85:18-22.) ETD did not attempt to remove the remaining six spark plugs. (86:14-22.)

11. ETD flatbedded the vehicle to a local Ford/Lincoln Dealership, Town Motors, to have the broken spark plug removed. (86:14-22, 89:3-10; Ex. 22.)

12. ETD initially charged Weisberg $250 for the removal and replacement of the one plug. (87:2-10.). Weisberg refused to pay $250 and eventually paid ETD a total of $150 for the removal and replacement of the two plugs (111:5-9.)

13. Weisberg traded in his 2007 Expedition for a Volkswagen Touareg at Gunther Volkswagen when his Expedition had approximately 100,000 miles on it. (98:11-14; 114:7-19.)

14. Weisberg believes that Ford's conduct caused him damages in the amount of $150.00. (125:2-4.)

(1:12-md-2316)

**U.  Additional Stipulated Facts**

1.  Ford issued four Technical Service Bulletins that address the service procedure for techniques to remove the spark plugs and extract broken spark plugs from certain three valve engines ("Covered Engines") manufactured by Ford.  "Covered Engines" mean 5.4 liter three valve engines and 6.8 liter three valve engines with build dates before October 8, 2007 and 4.6 liter three valve engines with build dates before November 30, 2007.

2.  Ford manufactured more than 2,000,000 vehicles that contained Covered Engines.

3.  Ford issued the first TSB (TSB 06-5-9) on March 3, 2006.

4.  Ford issued the second TSB (TSB 06-15-2) on July 14, 2006.

5.  Ford issued the third TSB (TSB 08-1-9) on January 8, 2008.

6.  Ford issued the fourth TSB (TSB 08-7-6) on April 1, 2008.

7.  According to TSB 08-7-6, if a spark plug in a Covered Engine separates or breaks, it will do so in one of three failure modes:

a.  Mode 1:  The ground electrode shield is left behind as an empty shell;

b.  Mode 2:  The entire porcelain insulator and ground electrode shield remains in the cylinder head; and

c.  Mode 3:  The upper section of porcelain breaks off with remaining porcelain left inside the ground shield.

8.  At or about the time that TSB 06-5-9 was issued, Ford provided one Rotunda Special Service Tool 303-1203 free of charge to each of its authorized new car or truck dealerships.

49

(1:12-md-2316)

9.  The Rotunda Special Service Tool 303-1203 is designed to work with an empty ground electrode shield that is stuck in a Covered Engine.

10.  At or about the time that TSB 08-7-6 was issued, Ford provided one Rotunda Tool Kit 303-1398 free of charge to each of its authorized new car or truck dealerships.

11.  The Rotunda Tool Kit 303-1398 is designed to remove fractured porcelain from a ground electrode shield that is stuck in a Covered Engine.

12.  According to each of the four TSBs, it is necessary to adhere exactly to the procedure contained in the TSBs.

13.  Each of the four TSBs instruct that new plugs should be installed using a film coating of nickel anti-seize on the ground electrode shield.

14.  Ford did not apply anti-seize on the spark plug ground electrode shields during the manufacture of the Covered Engines.

15.  As to the spark plugs placed into the Covered Engines by Ford during the manufacturing process, anti-seize was not pre-applied to the spark plug ground electrode shields by the manufacturer of the spark plugs.

16.  Each of the four TSBs state that work performed pursuant to the TSBs is "eligible under provisions of new vehicle limited warranty coverage and emissions warranty coverage."

17.  Each of the four TSBs instructs the dealership performing the work to "claim labor as actual time."

18.  TSB 08-7-6 covers the following vehicles manufactured by Ford that contain a Covered Engine:

50

(1:12-md-2316)

    a.  2005-2008 Ford Mustangs

    b.  2004-2008 Ford F-150 Trucks

    c.  2005-2008 Ford Expeditions, F-Super Duty Trucks

    d.  2006-2008 Ford Explorers

    e.  F-53 Motorhome Chassis Vehicles

    f.  2007-2008 Ford Explorer Sport Trac Vehicles

    g.  2005-2008 Lincoln Navigators

    h.  2006-2008 Lincoln Mark LT Trucks

    i.  2006-2008 Mercury Mountaineers

19.  The Service Labor Time Standard for F-150 5.4 liter three valve engine spark plug replacement is 1.4 hours.

20.  Ford's 5.4 liter and 6.8 liter three valve engines manufactured on or after October 9, 2007 utilize a low thread spark plug.

21.  Ford's 4.6 liter three valve engines manufactured on or after November 30, 2007 utilize a low thread spark plug.

**V.  Cases filed**

The following cases were filed in district courts in Ohio, Florida, California, and Georgia:

| MDL Case Number | Original Case Number | Case Caption |
| --- | --- | --- |
| 1:12-ds-35000 | 5:10-cv-00514 | Perko, *et al.* v. Ford Motor Company |
| 1:12-ds-35001 | 11-23086-CIV-ALTONAGA/Simonton | Pezzi v. Ford Motor Company |
| 1:12-ds-35002 | CV11-03870 AHM (MRWx) | Tom Stibbie, *et al.* v. Ford Motor Company |
| 1:12-ds-35003 | 12-60037-CV-WILLIAMS | Wendi Lanzi v. Ford Motor Company |

(1:12-md-2316)

| 1:12-ds-35004 | 2:12-cv-00031-RWS | Terry Kimbrell v. Ford Motor Company |
|---|---|---|

The Master Consolidated Amended Complaint (ECF No. 43 in Case No. 1:12-ds-35000),

filed on June 15, 2011 in Case No. 5:10-cv-00514, is the operative Complaint.[27]  It asserts claims

for, *inter alia*, consumer fraud and breach of express warranties.

### III.  Standard of Review

Summary judgment is appropriately granted when the pleadings, the discovery and

disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);

*see also Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005).  The moving party is not required

to file affidavits or other similar materials negating a claim on which its opponent bears the

burden of proof, so long as the movant relies upon the absence of the essential element in the

pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322 (1986).  The moving party must "show that the non-moving party has

failed to establish an essential element of his case upon which he would bear the ultimate burden

of proof at trial."  *Guarino v. Brookfield Twp. Trustees.*, 980 F.2d 399, 403 (6th Cir. 1992).

Once the movant makes a properly supported motion, the burden shifts to the non-moving

party to demonstrate the existence of a genuine dispute.  An opposing party may not simply rely

on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be

---

[27]  A sixth case, *Buckeye Management Group LLC, et al. v. Ford Motor Company*,
Case No. 1:11CV0845, was filed in this Court and was consolidated under the *Perko*
caption.  The Master Consolidated Amended Complaint includes the *Buckeye
Management* Plaintiffs and their claims.  Therefore, *Buckeye Management* was
administratively closed (ECF No. 61 in Case No. 1:12-ds-35000).

(1:12-md-2316)

resolved by a jury." *Cox v. Ky. Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). The non-moving party must, to defeat the motion, "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Guarino*, 980 F.2d at 403. In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

The United States Supreme Court, in deciding *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), stated that in order for a motion for summary judgment to be granted, there must be no genuine issue of material fact. *Id.* at 248. A fact is "material" only if its resolution will affect the outcome of the lawsuit. In determining whether a factual issue is "genuine," the court must decide whether the evidence is such that reasonable jurors could find that the non-moving party is entitled to a verdict. *Id.* Summary judgment "will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990). The existence of a mere scintilla of evidence in support of the non-moving party's position ordinarily will not be sufficient to defeat a motion for summary judgment. *Id.*

## IV. Analysis

According to Ford, what Plaintiffs complain about is that some (but not all) of their customers may pay more than what they think they should have to pay to replace a spark plug

(1:12-md-2316)

when they replace the spark plugs at issue after 100,000 miles of very good use.  Ford maintains that Plaintiffs are asking the Court to rule in a way no court in any state, including the six states that are at issue here, has yet ruled.  And in doing so, Ford contends that Plaintiffs have not cited a single case in which a product that performs as intended for its useful life (in this case 100,000 miles), but costs more to replace than Plaintiffs think it should at the end of its useful life, actually gives rise to a claim that it is not merchantable; that it breached some express warranty which expired many tens of thousands of miles ago; or that the failure ignites a duty to disclose the potential replacement costs of that product on a vehicle that has thousands of components.

Ford argues that for the Court to recognize such a claim would be contrary to the diversity principles which the Sixth Circuit set forth in *Combs v. International Ins. Co.*, 354 F.3d 568 (6th Cir. 2004), that when this court, sitting in diversity, is "given a choice between an interpretation of [state] law which reasonably restricts liability, and one which greatly expands liability, we should choose the narrower and more reasonable path." *Id.* at 577 (alteration in original) (quoting *Todd v. Societe Bic, S.A.*, 21 F.3d 1402, 1412 (7th Cir. 1994) (en banc).

**A.  Consumer Fraud/Misrepresentation Claims of All Plaintiffs**

Ford argues that summary judgment should be granted on the statutory consumer fraud/misrepresentation claims of all Plaintiffs based on alleged misrepresentations because none of them saw or heard the alleged misrepresentations.  *De Bouse v. Bayer AG*, 922 N.E.2d 309, 316 (Ill. 2009); *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 687 (Tex. 2002).

Plaintiffs did not respond to this argument in their amended memorandum in opposition (ECF No. 55-1) because they are not seeking relief on their statutory fraud claims based on an

54

(1:12-md-2316)

affirmative misrepresentation by Ford.  Rather, the statutory claims stem from Ford's

omissions/failure to disclose known defects.  *See* ECF No. 69 at PageID #: 4966.

### B.  Consumer Fraud/Omission Claims of All Plaintiffs

Plaintiffs have brought separate claims under the New Jersey Consumer Fraud Act,

N.J.S.A. 56:8-1 *et seq.*, Texas Deceptive Trade Practices Act, TEX. BUS. & COM.CODE §

17.41 *et seq.*, Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et*

*seq.*, Michigan Consumer Protection Act, MCL 445.901 *et seq.*, Florida Deceptive and Unfair

Trade Practices Act, § 501.201 *et seq.*, Fla. Stat., and Ohio Consumer Sales Practices Act, Ohio

Rev. Code § 1345.01 *et seq.*

### 1.  Whether Ford has an obligation to disclose all of the specific defects that might occur after the warranty expires

Ford argues that summary judgment should be granted against all Plaintiffs on their

statutory consumer fraud claims based on alleged omissions because the omitted information was

not material.  According to Ford, no reasonable person would consider a disclosure concerning

the cost of replacing one component out of thousands at 100,000 miles to be material to her

purchase decision.  Plaintiffs own expert, R. Scott King, testified that it would be "ridiculous" to

make decisions based on information like this.  ECF No. 56-4 at PageID #: 4502, Page 274; *see*

*also* ECF No. 57 at PageID #: 4588; ECF No. 72 at PageID #: 4983.  Ford maintains that it has

no obligation to disclose all of the specific defects that might occur after the warranty expires.

*Perkins v. DaimlerChrysler Corp.*, 890 A.2d 997, 1004 (N.J. Super. Ct. App. Div. 2006); *Wilson*

*v. Hewlett-Packard Co.*, 668 F.3d 1136, 1141-43 (9th Cir. 2012) (a manufacturer has no duty to

inform consumers of defects that will manifest outside the warranty period unless the

55

(1:12-md-2316)

manufacturer has affirmatively misrepresented the defective nature of the product or the defect

poses a safety risk to consumers); *Yancey v. Remington Arms Co., LLC*, Nos. 1:12CV477,

1:12CV437, 1:10CV918, 2013 WL 5462205, at *11 (M.D.N.C. Sept. 30, 2013) (allegation that

manufacturer failed to disclose defect "is nothing more than a 'run-of-the-mill breach of warranty

claim' and as such is insufficient to state [a consumer fraud claim]").

 Ford cites the recent decision in *Wiegel v. Stork Craft Mfg., Inc.*, No. 09-C-7417, 2013

WL 2243094 (N.D. Ill. May 21, 2013) (ECF No. 63-2) in support of its argument that it cannot

be held liable for failing to disclose the potential cost of a repair at 100,000 miles.  In *Wiegel*, the

plaintiff alleged that drop-side cribs were defective and that the manufacturer had failed to

disclose to purchasers "that infants and young children were reported to have been injured or

killed while using the cribs." *Id.* at *7.  The court granted summary judgment against plaintiff on

her Illinois Consumer Fraud and Deceptive Business Practices Act claim.  The court held that the

omission claim was "implausible" because no manufacturer provided the type of disclosure

demanded by the plaintiff. *Id.* at *8.

 According to Plaintiffs, there are genuine issues of material fact as to the materiality of

the defect.  Contrary to Ford's characterization of Plaintiffs' allegations, this is not a case about

parts that may fail.  This is a case about a material defect that was known to Ford, that Ford did

not disclose, and that Ford knows exists on every single one of these vehicles.  The complaint is

not about some random component out of thousands.  The specific facts set forth in the

evidentiary record before the Court makes clear that Ford knew about this problem in 1997,

almost six years before it brought these vehicles with three-valve engines containing the high

(1:12-md-2316)

thread spark plugs to market, but did not disclose the defect to its customers.  *See Steve Doyle et al. v. Chrysler Group LLC*, No. 8:13-cv-00620-JVS-AN, slip op. at 16 (C.D. Cal. Jan. 29, 2014) (ECF No. 76-1) (finding plaintiffs sufficiently alleged a duty to disclose a known defect under Maryland's Consumer Protection Act).

Plaintiffs cite *Chamberlan v. Ford Motor Co.*, 369 F. Supp.2d 1138 (N.D. Cal. 2005).  In *Chamberlan*, the plaintiffs alleged that defendant concealed material information about the intake manifolds in the engines of their cars.  The court stated:

> Defendant argues that Plaintiffs' showing is insufficient without direct evidence that reasonable customers choose which cars to buy based on the reliability of particular components.  This type of evidence is not necessary in order for a reasonable jury to conclude that a failure to disclose such heightened risks is material.  Because most manifolds do last the life of the engine, it is not surprising that manifold reliability is usually not a factor in the decision of which car to purchase.  The fact that most consumers do not consider manifold reliability does not lead to the conclusion that the average consumer would not consider an increased rate of post-warranty failure to be material either to choice of car or price.  Plaintiffs' evidence is sufficient to establish a dispute of fact regarding materiality.

*Id.* at 1145.  Plaintiffs and the absent class members in the case at bar have indicated that had Ford disclosed the defect, they would not have purchased, or would have paid less for, the vehicles.  Plaintiffs contend the defect is material to a reasonable consumer.  Furthermore, Ford's own documents also establish materiality.  In addition, materiality is established by the fact that when the spark plugs in a vehicle are changed at a Ford dealership, Ford requires its dealers to

(1:12-md-2316)

follow the Technical Service Bulletins.[28]

Ford responds to Plaintiffs' reliance on *Chamberlan* by citing *Smith v. Ford Motor Co.,* *749 F. Supp.2d 980 (N.D. Cal. 2010)*, a case that was affirmed by the Ninth Circuit, *462* *Fed.Appx. 660 (9th Cir. 2011)*.  In *Smith*, the district court granted Ford's motion for summary judgment and held that where a plaintiff's claim under California's Consumer Legal Remedies Act is predicated on a manufacturer's failure to inform its customers of an ignition-lock's likelihood of failing outside the warranty period, the risk posed by such asserted defect cannot be merely the cost of the product's repair; rather, for the omission to be material, the failure must pose safety concerns.  749 F. Supp.2d at 987.

### a.  New Jersey authority

Ford argues that controlling New Jersey authority requires summary judgment on the consumer fraud/omission claims.  In *Perkins, supra*, New Jersey's intermediate appellate court

---

[28]  The Technical Service Bulletins must be followed at Ford dealerships whenever these spark plugs are removed.  The TSBs were not widely broadcast outside of Ford because Ford rejected a customer notification program regarding the alleged defect. ECF No. 48-39 at PageID #: 3724; ECF No. 48-40 at PageID #: 3726.  This was done despite the fact that historically a lot of vehicle owners replace spark plugs themselves or take their vehicle to an independent shop.  Ford did not want to advertise Technical Service Bulletins to aftermarket service providers because ". . . customer's perception of TSBs are that they are Ford's admittance to a product defect and therefore the repair should be paid for by Ford . . . ."  ECF No. 48-42 at PageID #: 3771 (emphasis in original).

In 2008, Ford employee Don Fitz suggested that Ford provide the Technical Service Bulletins to consumers to help them reduce spark plug replacement costs.  ECF No. 48-41 at PageID #: 3753-54.  This suggestion was rejected by Ford managers and in-house counsel (ECF No. 48-41 at PageID #: 3751-52), as was a discussion of a warranty extension (*see*, *e.g.*, ECF No. 48-47 at PageID #: 3784).

Ford notes, however, that the Technical Service Bulletins were available to the public for free from NHTSA and by subscription from independent companies.

(1:12-md-2316)

held that the statutory consumer fraud claim based on failure to disclose an alleged defect in the

exhaust manifold was properly dismissed. The court stated:

> recognizing a viable [New Jersey Consumer Fraud Act ("CFA")] claim in the
> circumstances presented would essentially compel manufacturers and sellers to
> warrant their products and component parts beyond that to which the parties
> expressly agreed. Courts do not rewrite contracts into which parties have freely
> and voluntarily entered. To interpret the CFA, beyond its present scope, to cover
> claims that the component part of a product, which has lasted through the
> warranty period, may eventually fail, would be tantamount to rewriting that part of
> the contract which defined the length and scope of the warranty period. We
> decline to interpret the CFA to permit a claim which has that effect.

*Id.* at 1005 (citations omitted). According to Ford, *Perkins* makes it very clear that

manufacturers do not have a duty to disclose and it does not give rise to a consumer fraud claim

if a manufacturer does not disclose every potentially known or unknown defect, because to do so

would make the warranties worthless. In *Glass v. BMW of North America, LLC*, No. 10-5259

(ES), 2011 WL 6887721 (D.N.J. Dec. 29, 2011), the court applied *Perkins* in dismissing claims

based on an allegedly defective power steering system causing loss of vehicle control. *Id.* at *10.

Ford also relies on *Nobile v. Ford Motor Co.*, No. 10-1890 (PGS), 2011 WL 900119, at *6

(D.N.J. March 14, 2011) (alleged transmission defects); *Duffy v. Samsung Elecs. Am., Inc.*, No.

CIV.06-5259 (DRD), 2007 WL 703197, at *8 (D.N.J. March 2, 2007) (allegedly defective

microwaves that would start by themselves and cause fires); and *Noble v. Porsche Cars N. Am.,

Inc.*, 694 F. Supp.2d 333, 337 (D.N.J. 2010)[29] (alleged defect in water cooled engine) to support

---

[29] In *Grodzitsky v. American Honda Motor Co.*, No. 2:12-cv-1142-SVW-PLA,
2013 WL 2631326 (C.D. Cal. June 12, 2013) (ECF No. 63-1), the California court
dismissed plaintiff's New Jersey CFA claim pursuant to Fed. R. Civ. P. 12(b)(6) stating
that "a plaintiff cannot maintain an action under New Jersey's CFA when the only
allegation is that the defendant 'provided a part—alleged to be substandard—that

(continued...)

59

(1:12-md-2316)

its position that there is no duty to disclose in the case at bar.  ECF No. 42-1 at PageID #: 489-90;

ECF No. 57 at PageID #: 4584-85; ECF No. 72 at PageID #: 5036-38.

Plaintiffs contend Ford's reliance on *Perkins* (and the federal cases relied upon by Ford

which applied *Perkins*) is wholly misplaced because Ford knew in the case at bar that the defect

would manifest during the warranty period.  According to Plaintiffs, in *Tatum v. Chrysler Group,*

*LLC*, No. 10-cv-4269 (DMC) (JAD), 2011 WL 1253847 (D.N.J. March 28, 2011), the Court

confirmed the limited holding of *Perkins*:

> As the Court in *Perkins v. DaimlerChrysler Corp.*, 383 N.J. Super. 99, 890 A.2d
> 997, 1004 (N.J.Super.Ct.App.Div. 2006) held, "in cases such as this one, where an
> allegedly-defective product was covered by a warranty, "[a] claim that a defect
> may, but has not, manifested itself until after the expiration of the warranty period
> cannot form the basis of a claim under the [NJ]CFA.  Rather, a plaintiff must
> sufficiently allege that the defendant manufacturer *knew with certainty* that the
> product at issue or one of its components was going to fail."  (See *Maniscalco v.*
> *Bro. Int'l Corp.*, 627 F. Supp.2d 494, 501-02 (D.N.J. 2009).

*Id.* at *5 (alteration and emphasis in original).

In *Mickens v. Ford Motor Co.*, 900 F. Supp.2d 427 (D.N.J. 2012), the court held that

warranty coverage of a potential defect does not, as a matter of law, negate a knowing omission

claim under the CFA.  *Id.* at 442.  The *Mickens* court refused to dismiss the complaint in that

---

[29](...continued)
outperforms the warranty provided.'"  *Id.* at *9 (quoting *Noble*, 694 F. Supp.2d at 337).
"Plaintiffs do not, and cannot, allege that the Window Regulator Defect occurred during
the warranty period; thus, they cannot state a claim under New Jersey's CFA."  *Id.*
Contra *Kuzian v. Electrolux Home Prods., Inc.*, 937 F. Supp.2d 599, 614 (D.N.J. 2013)
(holding that consumers adequately stated claim against refrigerator manufacturer for
violation of New Jersey's CFA); *Francis E. Parker Memorial Home, Inc. v.*
*Georgia-Pacific LLC*, 945 F.Supp.2d 543, 560 (D.N.J. 2013) (holding that plaintiff stated
claims under New Jersey's CFA where plaintiff alleged that the manufacturer sold
defective exterior trim that prematurely deteriorated under normal conditions, knew of the
defects prior to the sale, and failed to disclose the defects).

(1:12-md-2316)

case because the defect ("galvanic corrosion") was "certain to occur in all of these vehicles" and

Ford "knew that galvanic corrosion would occur to all of the vehicles." *Id.*[30]  In *Coba v. Ford*

*Motor Co.*, No. 12-1622 (DRD), 2013 WL 244687 (D.N.J. Jan. 22, 2013) (ECF No. 65-7), a New

Jersey court rejected Ford's argument that it had no obligation to disclose known defects because

"the potential for defects to occur both within the warranty period and beyond *was* disclosed in

Ford's warranty" (ECF No. 42-1 at PageID #: 489) (emphasis in original)):

> The notion that a manufacturer would be absolved from liability for knowingly
> omitting a defect because it acknowledges the possibility of defects in its warranty
> is both illogical and contrary to the spirit of the NJCFA.  Indeed, this Court
> recently held that "[w]arranty coverage of a particular problem does not, as a
> matter of law, negate a[NJ]CFA claim that the manufacturer knowingly omitted
> information about a . . . defect."

*Id.* at 9 (quoting *Mickens*, 900 F. Supp.2d at 442) (alterations in original).

---

[30]  In *Neale v. Volvo Cars of North America, LLC*, No. 2:10-cv-4407 (DMC)(MF),
2013 WL 1223354 (D.N.J. March 26, 2013) (ECF No. 62-2), the plaintiffs alleged, as do
Plaintiffs here, that an automobile manufacturer failed to disclose a known defect.  The
*Volvo* court granted plaintiffs' motion for certification of state subclasses and denied
defendants' motions for summary judgment.

> In finding that certification of Plaintiffs' proposed statewide classes is
> warranted, the Court finds that triable issues of fact exist.  These issues
> include whether the design of the Sunroof Drainage Systems were
> defectively designed, whether Defendants knew of the defect but failed to
> disclose it to the Class, and whether the maintenance instructions were
> inadequate and/or uniformly deficient.  These issues are more than
> sufficient to warrant denial of Defendants' individual Motions for
> Summary Judgment.

*Id.* at *12.  *See also In re Philips/Magnavox Television Litig.*, No. 09-3072 (PGS), 2010
WL 3522787, at *7 (D.N.J. Sept. 1, 2010) (ECF No. 65-1) (warranty based defense
unavailable where there are allegations of intentional concealment of a product defect);
*Henderson v. Volvo Cars of North America, LLC*, No. 09-4146 (DMC)(JAD), 2010 WL
2925913, at *6 (D.N.J. July 21, 2010) (ECF No. 65-2) (same).
.

(1:12-md-2316)

Ford responds that the ground electrode shield of the spark plug is not certain to break in all vehicles.  Plaintiff Kinch had his spark plugs replaced on his 2004 F-150 and not a single one broke.  ECF No. 41 at PageID #: 433.  So, if the requirement is to disclose a defect that is certain to occur in all vehicles, and Plaintiffs' defect is breakage, there is no issue of fact.  Breakage does not occur in all vehicles based upon Plaintiffs' own experience.

> According to Plaintiffs:
>
> So the design at issue and Ford's knowledge about the defect, it relates to this process where the hydro- --the carbon builds up and it becomes difficult to remove and extract the spark plugs.
>
> So that's the defect.  And it's Ford's knowledge of that defect that we're saying gave rise to the duty to disclose.

ECF No. 72 at PageID #: 4998.  Therefore, Plaintiffs do not allege that the defect is breakage, but rather it is the build up of unburned hydrocarbons that are forced into a gap between the ground electrode shield and the engine's cylinder head as a result of the design defect.  These hydrocarbons then condense against the cooler cylinder head walls and form carbon deposits which lock the plugs in place.  According to Plaintiffs, Ford is not contesting that there is a defect or that it had knowledge of the defect.  The Court finds that at a minimum, there is a question of fact as to whether the defect about which Plaintiffs are suing actually occurs within the warranty period.

If, on the other hand, Plaintiffs' complaint is that they are paying more to have the spark plugs replaced—Plaintiffs' expert, R. Scott King, estimated it costs at least $265 to replace eight spark plugs on the F-150 5.4L three-valve engine.  *See* ECF No. 51-1 at PageID #: 4197-98.

(1:12-md-2316)

According to Ford, if that cost is the level of defect, there is no issue of fact because $265 is not certain in all vehicles.  *See* ECF No. 57-3.[31]

Plaintiffs respond that there are only a couple of them that, when they had their spark plugs replaced, paid less than the $265 benchmark that Mr. King put forth.  Some received a discount because they complained to the dealer or had a relationship with the dealer.  In addition, 30 of the absent class members had their spark plugs replaced at authorized Ford dealerships, which would have had the benefit of the Technical Service Bulletins.  *See* ECF No. 48-7 at PageID #: 3238-3356.  The average cost of repair for the absent class members is over $1,800.  ECF No. 48-7 at PageID #: 3231-3337.

With respect to the next group of people that Ford argues has not been damaged—those whose replacement cost is roughly the $280 to $500 range— Ford argues they have not been damaged because the amount they paid for labor falls within the range of what Ford says is an appropriate labor charge.  According to Plaintiffs, focusing on only the cost for labor ignores the total bill.  The total bill for many of these Plaintiffs included being charged for the special tools

---

[31]  A chart of all Plaintiffs and Precast vehicles as to which there is no evidence that more than $500 (or $62.50 per plug) was paid for spark plug replacement labor.

(1:12-md-2316)

and other factors that went into a much higher cost.[32]

The Court will permit the New Jersey CFA claim to be decided by the trier of fact because of the evidence in the record of Ford's actions and omissions in the face of its knowledge of the alleged defect.

### b. Remaining states

Ford argues that law, logic, and policy dictate summary judgment in its favor based on Florida, Illinois, Michigan, Ohio, and Texas law.

Ford states in its reply memorandum:  "Contrary to Plaintiffs' suggestion, Ford's position would not eliminate all omission-based claims.  A seller who knows that a particular problem **is** occurring, or **will to a certainty** occur, must disclose that problem."  ECF No. 57 at PageID #: 4589 n. 2 (emphasis in original).  Plaintiffs argue:  "That is our case.  And certainly at summary judgment, there's a genuine issue of material fact as to whether or not that's true on this factual record."  ECF No. 72 at PageID #: 5004.  The Court agrees with Plaintiff that, on the factual record in the case at bar, there is a genuine issue of material fact regarding whether a material defect was known to Ford, that Ford did not disclose, and that Ford knows exists on every single one of these vehicles.

---

[32] The following Plaintiffs spent the stated amounts to have their spark plugs replaced:

| | |
|---|---|
| Garber | $  970 |
| Ernestburg | 3,200 |
| Jennings | 1,400 |
| Pignato | 760 |
| Brewer | 720 |
| East Texas Poultry Supply | 1,200 |
| Wall | 825 (dealership gave him a credit of about $800) |

(1:12-md-2316)

### 2. Whether Plaintiffs have proven that any loss was caused by the alleged omission

Ford argues that summary judgment should be granted against Plaintiffs because they cannot prove that any loss was caused by the alleged omission.

### a. Whether Plaintiffs can show that they would not have purchased their vehicles if they had known of the alleged defect

Ford argues that summary judgment is required against all Plaintiffs (but particularly Plaintiffs Ernestburg, Brewer, Perko, Kinch, and Luke) on their statutory consumer fraud claims based on alleged omissions because Plaintiffs cannot prove causation.  *Elyria-Lorain Broad. Co. v. Loraine J. Co.*, 298 F.2d 356, 360 (6th Cir. 1961) ("[A] witness may not testify to what he would have done had the situation been different from what it actually was; *Metro Allied Ins. Agency, Inc. v. Lin*, 304 S.W.3d 830, 835 (Tex. 2009).  According to Ford, Plaintiffs cannot prove that they would *not* have purchased their vehicles if they had known of the alleged defect. Ford contends that any testimony to this effect is not admissible; Perko, Ernestburg, and Brewer testified that they did not know what they would have done (ECF No. 42-27 at PageID #: 2547; ECF No. 42-17 at PageID #: 1815-16; 1817; ECF No. 42-13 at PageID #: 1533); and Kinch and Luke gave affirmative testimony that they would make the same purchase decision today (ECF No. 42-21 at PageID #: 2065; 2072; ECF No. 42-25 at PageID #: 2340).

According to Plaintiffs, there are genuine issues of material fact as to whether Ford's failure to disclose the defect caused Plaintiffs to be damaged.  Certain Plaintiffs have testified that, had they been aware of the defect, they would not have purchased, or would have paid less for, the vehicles.  *See Mickens*, 900 F. Supp.2d at 447 (Under New Jersey law, a plaintiff

65

(1:12-md-2316)

adequately alleges a NJCFA claim when they assert that they would not have purchased a vehicle if the defect at issue had been disclosed.); *Estate of Knoster v. Ford Motor Co.*, No. 01-3168 (MLC), 2008 WL 5416399, at *9 (D.N.J. Dec. 22, 2008) (denying summary judgment to Ford on consumer fraud claim involving its omission to provide a warning that vehicle was prone to sudden acceleration, and finding plaintiff's testimony about what she would have done if the information was provided to create a genuine fact issue); *Borror v. MarineMax of Ohio, Inc.*, No. OT-06-010, 2007 WL 431737, at *7 (Ohio App. 6th Dist. Feb. 9, 2007) (sufficient evidence for Ohio Consumer Sales Practices Act claim where plaintiff "testified that he would not have purchased the boat if he had been told the truth about the damage").  Moreover, Plaintiffs have provided expert testimony from R. Scott King that they paid more to change their spark plugs than they would have absent the defect.  *See* ECF No. 48-62 at PageID #: 3977-78.

### b.  Whether Plaintiffs who received no communications from Ford can proof causation

All of the consumer fraud statutes at issue require proof of causation.  Ford argues that summary judgment is required against Plaintiffs Anz, Kolinek, Wall, Brewer, Ernestburg, Kinch, Kmet, Jennings, and Pignato on their statutory consumer fraud claims based on alleged omissions because they cannot prove that the alleged omission caused any loss.  Ford contends that these Plaintiffs cannot prove causation because they cannot show that they would have seen or heard a disclosure from Ford, even if one had been made.  *De Bouse*, 922 N.E.2d at 316.

In *Daniel v. Ford Motor Co.*, No. CIV. 2:11-02890 WBS EFB, 2013 WL 2474934, at *4-6 (E.D. Cal. June 7, 2013) (ECF No. 63-3), the plaintiffs brought claims under the California consumer protection statutes alleging that Ford failed to disclose the potential for premature tire

(1:12-md-2316)

wear.  The Court granted summary judgment against all Plaintiffs because none of them saw any

materials in which a disclosure might plausibly have been made:

> Here, even assuming that defendant had a duty to disclose the defect and tire wear
> as safety issues, there is no evidence that plaintiffs researched the maintenance
> history of Ford Focuses, read the warranty or maintenance booklets before buying
> their vehicles, or otherwise saw Ford materials which could have plausibly
> contained any disclosure had it been made.  Plaintiffs cannot establish reliance on
> an omission in Ford's television advertisements, brochures, or other materials
> since they "cannot establish that had the information been included [in any of
> defendant's materials they] would have been aware of it and behaved differently."

*Id.* at *6 (internal footnote and citations omitted).  Reliance, however, is not a requirement under

the consumer protection statutes of at least five of the six bellwether states at issue here (with

Texas potentially being the exception).  *See* Section IV.C.2.a., *infra*.

Regarding the claims of Plaintiff Pignato (resident of Illinois), Ford cites *Weske v.*

*Samsung Electronics America, Inc.*, 934 F.Supp.2d 698 (D.N.J. 2013).  The plaintiffs in *Weske*

alleged that Samsung violated the Illinois Consumer Fraud Act by failing to disclose defects in

refrigerators.  Finding that "Plaintiffs have not alleged that [they] ever received a communication

from Samsung," the court concluded "Plaintiffs have not stated a claim under the ICFA."  *Id.* at

704.  It is to be noted, however, that the court granted Plaintiffs one more opportunity to amend

their pleading to address the deficiencies.  *Id.* at 711.

In response to Ford's arguments, Plaintiffs contend that Ford frames the issue in such a

way as to require Plaintiffs to prove that they would have seen a disclosure that Ford did not

make.  According to Plaintiffs, the key inquiry is whether Ford had a duty to disclose the defect.

In *Francis E. Parker Memorial Home, Inc.*, *supra*, the New Jersey court refused to

dismiss the claims of plaintiff homeowners because the plaintiffs did not allege that they "read,

(1:12-md-2316)

heard, saw, or knew of any affirmation of fact" by the defendant trim manufacturer, when each of

the proposed class members had received an express written warranty upon purchasing the

product.  945 F. Supp.2d at 569.  In *Mazur v. Milo's Kitchen, LLC*, No. 12-1011, 2013 WL

3245203 (W.D. Pa. June 25, 2013), a case in which the court refused to dismiss breach of

warranty and consumer fraud claims arising out from contaminated dog treats, the court stated:

> Defendants have not provided any reason for finding that their representations did
> not become a basis for the bargain and, hence, it can be inferred that Plaintiff
> believed the treats were healthy and safe as represented by Defendants.  *See
> Samuel-Bassett v. Kia Motors America, Inc.*, 613 Pa. 371, 412, 34 A.3d 1, 25
> (2011), *cert. denied*, - - - U.S. - - - -, 133 S.Ct. 51, 183 L.Ed.2d 677 (2012) ("[a]
> written express warranty that is part of the sales contract is the seller's promise
> which relates to goods, and it is part of the basis of the bargain.  13 Pa.C.S. §
> 2313(a)(1).  This statement of law is not qualified by whether the buyer has read
> the warranty clause and relied on it in seeking its application")[.]

*Id.* at 6.

    The Court finds there are genuine issues of material fact as to whether Ford had a duty

to disclose the defect.

### 3. Purchasers of used vehicles

    Ford argues that summary judgment should be granted against Plaintiffs Anz, Kolinek,

Wall, Brewer, Ernestburg, Kinch, and Kmet on their statutory consumer fraud claims based on

alleged omissions because these Plaintiffs all purchased used vehicles.  Ford's alleged omissions

did not occur "in connection with" these transactions, and the alleged omissions were not made

with the intent that used-vehicle purchasers rely on them.  Therefore, these Plaintiffs have no

claim under the consumer fraud statutes of their states.  *Nissan Motor Co. Ltd. v. Armstrong*, 145

(1:12-md-2316)

S.W.3d 131, 149 (Tex. 2004); *Marrone v. Greer & Polman Constr., Inc.*, 964 A.2d 330 (N.J. Super. Ct., App. Div. 2009).

These Plaintiffs argue to the contrary that they have claims under their respective States' consumer fraud statutes despite buying their vehicles used.  Plaintiffs contend that, under Texas law, Ford's misrepresentations are sufficiently connected to the used vehicles of Plaintiffs Anz, Brewer, Kolinek, and Wall to subject Ford to liability under the Texas Deceptive Trade-Practices Act.  Tex. Bus. & Com.Code §§ 17.41–17.63 ("DTPA").  *Church & Dwight Co. v. Huey*, 961 S.W.2d 560, 564-66 (Tex. Ct. App. 1997).  According to Plaintiffs, the same is true for Ernestburg, Kinch and Kmet.  The New Jersey Consumer Fraud Act ("NJCFA") applies to direct and indirect purchasers.  N.J.S.A. § 56:8-1 *et seq.*  Plaintiffs Kmet, Kolinek, and Wall purchased their vehicles prior to the expiration of the New Vehicle Limited Warranty.[33]

### 4. Florida and Ohio Plaintiffs whose claims may be barred by the statute of limitations

Ford argues that summary judgment should be granted against Plaintiffs Sondgerath (resident of Florida), Perko, Jennings, and Kinch (residents of Ohio) on their statutory consumer fraud claims because the statute of limitations expired.  *Licul v. Volkswagen Group of America, Inc.*, No. 13-61686-CIV, 2013 WL 6328734, at *6 (S.D. Fla. Dec. 5, 2013) (statute of limitations on a Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") claim expires four years from the date of sale of the product at issue).  Ford contends that the discovery rule does not

---

[33]  Insofar as relevant to this litigation, the New Vehicle Limited Warranty promised only that during the warranty period authorized Ford dealers "will repair, replace, or adjust all parts on your vehicle that are defective in factory-supplied materials or workmanship."  *See e.g.*, ECF No. 42-8 at PageID #: 859.

(1:12-md-2316)

apply and did not delay accrual of the causes of action; tolling based on fraudulent concealment

is not recognized in Florida; and Ford did nothing to affirmatively conceal anything from these

Plaintiffs.  *See* *In re Ford Tailgate Litigation*, No. 11-CV-2953-RS, 2014 WL 1007066, at *7

(N.D. Cal. March 12, 2014) (finding plaintiffs argued incorrectly that the statute of limitations

was tolled until they discovered the defect according to the doctrine of fraudulent concealment).

Ford maintains that, on the contrary, Ford affirmatively disclosed the issue in publicly available

Technical Service Bulletins.  *Marlborough Holdings Grp., Ltd. v. Azimut-Benetti, Spa, Platinum*

*Yacht Collection No. Two, Inc.*, 505 Fed. Appx. 899, 906 (11th Cir. 2013) (ECF No. 63-8) (the

delayed discovery rule is inapplicable to actions under the FDUTPA because "FDUTPA is a

statute and actions under it are 'founded on a statutory liability,'" not "founded on fraud.");[34]

*Savett v. Whirlpool Corp.*, No. 1:12CV0310, 2012 WL 3780451, at *3 (N.D. Ohio Aug. 31,

2012) (Gaughan, J).

Plaintiffs argue there are genuine issues of material fact as to whether Ford actively

concealed the existence of the defect or otherwise tolled the statute of limitations by its conduct.

In any event, Plaintiff Sondgerath purchased his 2006 F-150 on or about May 25, 2006 (ECF No.

41 at PageID # 446), within four years of the filing of the nationwide class action complaint

(ECF No. 1) on March 10, 2010 in Case. No. 5:10-cv-514 making it timely regardless of whether

---

[34]  Plaintiffs maintain there is a split of authority on the delayed discovery rule in
Florida.  *See*, *e.g.*, *State Farm Mut. Auto. Ins. Co. v. Kugler*, No. 11-80051, 2011 WL
4389915, at *13 (S.D. Fla. Sept. 21, 2011) (declining to dismiss FDUPTA fraud claims
because of possible applicability of delayed discovery doctrine); *Butler Univ. v. Bahssin*,
892 So. 2d 1087, 1091-92 (Fla. Dist. Ct. App. 2004) (plaintiff's cause of action did not
accrue until discovery of defendant's fraudulent statements).  The Court does not decide
this issue because Plaintiff Sondgerath purchased his vehicle within four years of the
filing of the nationwide class action complaint (ECF No. 1).

70

(1:12-md-2316)

the statute of limitations was tolled by Ford's conduct.  *American Pipe & Constr. Co. v. Utah,* *414 U.S. 538, 554 (1974)*.

Regarding Plaintiffs Perko, Jennings, and Kinch, these Ohio Plaintiffs argue that at a minimum, there is a question of fact as to whether fraudulent concealment tolls their claims. "[U]nder certain circumstances Ohio law recognizes that the concealment of a cause of action can toll the statute of limitations."  *Phelps v. Lengyel*, 237 F. Supp.2d 829, 836 (N.D. Ohio 2002) (Economus, J).

> In order for concealment to toll the statute of limitations, courts have generally held that there must be something of an affirmative character designed to prevent, and which does prevent, discovery of the cause of action; or some actual artifice to prevent knowledge of the fact; or some affirmative act of concealment or some misrepresentation to exclude suspicion and prevent inquiry.  More recent case law in Ohio has reaffirmed the legal proposition that the statute of limitations may be tolled where there is some conduct of the adverse party, such as a misrepresentation, which excludes suspicion and prevents inquiry.

*Id.* (citations omitted).  But, Plaintiffs are not seeking relief on their statutory fraud claims based on an affirmative misrepresentation by Ford.  *See* Section IV.A, *supra*.  Plaintiffs argue that (1) the Technical Service Bulletins were not widely broadcast outside of Ford because Ford rejected a customer notification program regarding the alleged defect and (2) Ford did not want to advertise Technical Service Bulletins to aftermarket service providers.  Ford notes that the Technical Service Bulletins were available to the public for free from NHTSA and by subscription from independent companies.  *See* n. 28, *supra*.

The Court does not weigh the evidence when reviewing a motion for summary judgment. Instead, the Court accepts all of the allegations in the plaintiff's complaint as true and views the evidence in the light most favorable to the party against whom the motion is made.  *Mertik v.*

71

(1:12-md-2316)

*Blalock*, 983 F.2d 1353, 1356 (6th Cir. 1993).  A district court considering a motion for summary

judgment may not weigh evidence or make credibility determinations.  *Anderson*, 477 U.S. at

255; *Smith v. Campbell*, 250 F.3d 1032, 1036 (6th Cir. 2001); *Adams v. Metiva*, 31 F.3d 375, 384

(6th Cir. 1994).  Therefore, the Court will not weigh the evidence and will allow the statutory

consumer fraud claims of Plaintiffs Perko, Jennings, and Kinch to proceed to a jury.  *Phelps*, 237

F. Supp.2d at 837 (concluding that "there are genuine issues of material fact, as to whether

Defendants concealed Plaintiffs' averred recklessness cause of action thereby tolling the

applicable statute of limitations).

## C.  Express Warranty Claims

### 1.  New Vehicle Limited Warranty

When initially sold, all 35 vehicles came with Ford's New Vehicle Limited Warranty,

which provided "Bumper-to-Bumper" coverage for three years or 36,000 miles, whichever came

first.  *See*, *e.g.*, ECF No. 42-8 at PageID #: 847-49.  The issue presented by the within motion is

whether manifestation of the defect is required within the warranty period.  Ford argues that

summary judgment should be granted on Plaintiffs' express warranty claims based on the New

Vehicle Limited Warranty because there is no evidence that a single one of these Plaintiffs

experienced problems with their spark plugs within the warranty period.  *In re Ford Tailgate*

*Litigation*, 2014 WL 1007066, at *3-4 (dismissing claims for breach of express warranty

pursuant to Fed. R. Civ. P. 12(b)(6) where none of plaintiffs averred that the alleged defect

manifested during the warranty period); *Licul*, 2013 WL 6328734, at *2-4 (claim for breach of

(1:12-md-2316)

express warranty under Florida law dismissed because plaintiffs could not establish a breach of the express warranty during its term).

Plaintiffs point to Ford's own documents to support their contention that the defect is not only present during the New Vehicle Limited Warranty period, but that it manifested itself during this express warranty period.  *See, e.g.*,  ECF No. 48-6 at PageID #: 3229 ("Upon service removal of the spark plug after 10-20K miles . . . The average cost per repair = $1,700 (Min=$200; Max = $5600)").

### a. Repair and replace warranties

Ford argues that repair and replace warranties do not cover repairs made after the warranty period has expired.  Ford, therefore, maintains that summary judgment is required against all Plaintiffs on their express warranty claims based on the New Vehicle Limited Warranty.  According to Ford, no Plaintiff claims to have experienced problems within the warranty period.  *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 616 (3rd Cir. 1995); *Brisson v. Ford Motor Co.*, 349 Fed. Appx. 433, 434 (11th Cir. 2009).

Plaintiffs argue there are genuine issues of material fact regarding the differences between the 2004-2006 New Vehicle Limited Warranties (ECF No. 42-8 at PageID #: 851-981) and the 2007-2008 New Vehicle Limited Warranties (ECF No. 42-8 at PageID #: 983-1063).  The 2004-2006 New Vehicle Limited Warranties do not require presentment[35] during the warranty period and cover defects that exist prior to the expiration of the warranty period.  All Plaintiffs'

---

[35]  Ford is not arguing presentment in the case at bar.  "The issue of whether or not you actually have to bring your vehicle to a Ford dealer within the warranty period is not at issue in this case."  ECF No. 72 at PageID #: 5032.

(1:12-md-2316)

vehicles were subject to the defect prior to the expiration of the New Vehicle Limited Warranty as Ford's own documents admit that the defect is present by no later than 10,000 miles.  ECF No. 48-3 (Ford 6-Sigma presentation documenting breakage as early as 10,000 miles).  Further evidence that the defect is present prior to the expiration of the New Vehicle Limited Warranty is that the detailed and time-consuming spark plug removal process in Ford's Technical Service Bulletins is mandatory, regardless of mileage.

As stated above, there are two different New Vehicle Limited Warranties at issue in the case at bar.  Ford made significant revisions to the 2007-2008 New Vehicle Limited Warranties, adding two requirements that did not exist in the 2004-2006 New Vehicle Limited Warranties.  Ford added (1) a presentment requirement and (2) a requirement that the defective part at issue must malfunction or fail during the warranty period.

Ford's New Vehicle Limited Warranty did not require presentment until 2007.  The 2007-2008 New Vehicle Limited Warranties provide:

. . .if

- your Ford vehicle is properly operated and maintained; and

- *was taken to a Ford dealership for a warranted repair during the warranty period*,

then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle *that malfunction or fail during normal use during the applicable coverage period* due to a manufacturing defect in factory-supplied materials or factory workmanship.

ECF No. 42-8 at PageID #: 992-93; 1033-34 (emphasis added).

74

(1:12-md-2316)

The 2004-2006 New Vehicle Limited Warranties do not contain a presentment requirement. They only require that Ford know about the existence of the defect prior to the expiration of the warranty coverage period. The New Vehicle Limited Warranties for Ford cars and light trucks provide:

> Under your New Vehicle Limited Warranty, Bumper to Bumper Coverage begins at the warranty start date and lasts for three years or 36,000 miles, whichever occurs first. During this coverage period, authorized Ford Motor Company dealers will repair, replace, or adjust all parts on your vehicle that are defective in factory-supplied materials or workmanship. . . .

ECF No. 42-8 at PageID #: 859; 892; 925.[36] Plaintiffs argue that, under the 2004-2006 New Vehicle Limited Warranties, Ford was obligated to repair and replace parts that it knew were defective prior to the expiration of the warranty coverage period, regardless of whether the defect manifested or became known to the consumer, and regardless of whether the consumer presented the vehicle to the dealer during the warranty period.

Plaintiffs rely on at least two cases to support their argument that there are genuine issues of material fact regarding the differences between the 2004-2006 New Vehicle Limited Warranties and the 2007-2008 New Vehicle Limited Warranties. In *Werwinski v. Ford Motor Co.*, No. CIV.A. 00-943, 2000 WL 1201576 (E.D. Pa. Aug. 15, 2000), *aff'd*, 286 F.3d 661 (3rd Cir. 2002), the court found that a similar Ford warranty did not require presentment of the

---

[36] The 2006 New Vehicle Limited Warranty for Lincoln vehicles provides:
Under your New Vehicle Limited Warranty, Bumper to Bumper Coverage begins at the warranty start date and lasts for four years or 50,000 miles, whichever occurs first.
During this coverage period, authorized Ford Motor Company dealers will repair, replace, or adjust all parts on your vehicle that are defective in factory-supplied materials or workmanship.
ECF No. 42-8 at PageID #: 959.

(1:12-md-2316)

defective car during the durational term of the warranty, and denied Ford's request for dismissal

on that basis.

> The Court finds that the respective Ford warranties do not expressly require the presentment of the defective car within the warranty period.  It is true that some courts have held that a failure to comply with presentment requirements constitutes a failure to state a claim for a breach of express warranty.  *See Walsh v. Ford Motor Co.*, 588 F.Supp. 1513, 1537 (D.D.C. 1984); *Gross v. Systems Engineering Corp.*, 1983 WL 160568 (E.D. Pa. March 31, 1983).  But the language of the warranties in those cases clearly stated that the product had to be returned to the seller or manufacturer before the warranty period expired in order to be covered under the warranty's terms.

*Id.* at *2.  *Daffin v. Ford Motor Co.*, 458 F.3d 549 (6th Cir. 2006), also supports Plaintiffs'

position that Ford's New Vehicle Limited Warranty, at least during the 2004 through 2006 time

period, does not require presentment by the consumer during the warranty period.  In *Daffin*, the

Sixth Circuit noted that it was a "threshold issue . . . whether Ford's warranty promise can

reasonably be read to cover the alleged defect at issue in this case, regardless of manifestation

[*i.e.*, when the consumer knew about it] during the warranty period. . . ."  *Id.* at 554.

Ford responds by citing *Cannon Technologies, Inc. v. Sensus Metering Systems, Inc.*, 734

F. Supp.2d 753 (D. Minn. 2010).  In *Cannon Technologies, Inc.*, the court held that the plaintiff's

claim for breach of express warranty failed, because none of the iCon Meters at issue failed

during the express warranty period.  Plaintiff argued that the defendant breached its express

warranty because all of the iCon Meters were defective on the date they were sold, since they

contained a part doomed to fail.  The court found that argument lacked merit.  *Id.* at 762-63.

> As this Court has noted previously, a claim alleging breach of an express warranty of future performance cannot accrue until a defect actually manifests itself. . . .  Were it otherwise, temporal limitations on express warranties would have no meaning.  A plaintiff could always claim that a defect manifesting itself after the

(1:12-md-2316)

express-warranty period was endemic to the product on the date it was purchased, and hence the product was "defective" when bought.  Such a rule is non-sensical.

*Id.* at 763 (citations omitted).

Plaintiffs' claims in the case at bar are not tethered to post-warranty manifestation. Viewing the evidence in a light most favorable to Plaintiffs, the Court finds that there is a material issue of fact whether Ford knew that the defect would manifest inside the warranty period.  Plaintiffs' position significantly hinges on ECF No. 48-3 (Ford 6-Sigma presentation) indicating that the problem actually manifested itself at least by 10,000 miles.  Ford documents establish that the plugs are locked or stuck in the cylinder head at no later than 10,000 miles, well within the warranty period.  Therefore, at least for model years 2004, 2005, and 2006 vehicles, there is a jury question as to whether Ford had a contractual obligation to repair, replace, or adjust the known defective parts on Plaintiffs' vehicles during three years or 36,000 miles.  If so, a jury could find that Ford's failure to repair, replace, or adjust the defect in these model years is a breach of its New Vehicle Limited Warranty.

### b.  Whether the express warranty period is unconscionable

Ford argues that "failing to disclose a known defect does not, by itself, make a warranty unconscionable." *Weske*, 934 F.Supp.2d at 705; accord *Grodzitsky*, 2013 WL 2631326 at *12; *Seifi v. Mercedes-Benz USA, LLC*, C12-5493 TEH, 2013 WL 2285339, at *5 (N.D. Cal. May 23, 2013) (ECF No. 63-5); *Santos v. SANYO Mfg. Corp.*,12-11452-RGS, 2013 WL 1868268, at *4 (D. Mass. May 3, 2013) (ECF No. 63-6); see also *Licul*, 2013 WL 6328734, at *3.  In *Payne v. Fujifilm U.S.A., Inc.*, No. 7-385, 2007 WL 4591281, at *5 (D.N.J. Dec. 28, 2007), however, the

(1:12-md-2316)

court concluded that the defendant's knowledge of a defect can render a warranty procedurally unconscionable.

Ford also argues that Plaintiffs Anz, Kolinek, Wall, Brewer, Ernestburg, Kinch, and Kmet do not have standing to claim that the express warranty period is unconscionable because they purchased their vehicles used and were not parties to the contract.  *Perez v. Volkswagen Group of America, Inc.*, No. 2:12-CV-02289, 2013 WL 1661434, at *5 (W.D. Ark. April 17, 2013) (ECF No. 63-7) (the purchaser of a used vehicles "has no standing to argue that she was injured due to the alleged unconscionability of the Warranty."); *McInnis v. Spin Cycle-Euclid, L.L.C.*, No. 91905, 2009 WL 1419390, at *5 (Ohio App. 8th Dist. May 21, 2009).  The Court agrees that Plaintiffs Anz, Brewer, Ernestburg, and Kinch do not have standing to claim that the express warranty period is unconscionable.

Plaintiffs distinguish *Seifi*, *Santos*, and *Perez*.  The *Seifi* court dismissed plaintiffs' express warranty claim without prejudice to refiling an amended complaint after finding plaintiffs had pled facts sufficient to demonstrate procedural unconscionability under California law, but failed to sufficiently plead substantive unconscionability.  2013 WL 2285339, at *4-5. Unlike the specific facts set forth in the evidentiary record before the Court, the *Santos* court applied Massachusetts law and held the claim for breach of express warranty in "[t]he Amended Complaint provides nothing by way of particularized facts to suggest that SANYO ever had actual notice of the alleged defects." 2013 WL 1868268, at *4.  Finally, the *Perez* court, applying Arkansas law, observed that plaintiff became the owner of the vehicles well after the applicable warranty periods had expired on both vehicles.  2013 WL 1661434, at *4.  The court

78

(1:12-md-2316)

dismissed the breach of express warranty claim reasoning that the plaintiff could not have relied upon the expired warranty to which she was not a party, and that the plaintiff therefore did not have standing to argue that the warranty's limitations were unconscionable. Moreover the court held that the plaintiff's allegations regarding the defendant's pre-sale knowledge of the transmission defect amounted to nothing more than a "vague assumption, unsupported by any factual allegation." *Id.*

Plaintiffs argue that there are genuine issues of material fact as to whether Plaintiffs Kmet, Kolinek and Wall have standing to assert warranty claims, as they purchased their vehicles prior to the expiration of New Vehicle Limited Warranties. Used vehicle purchasers may have standing to assert unconscionability. *See Detroit, T. & I.R. Co. v. Detroit & T.S.L.R. Co.*, 6 F.2d 845, 854 (6th Cir. 1925) (finding contract unconscionable as to subsequent contract holder "without regard as to whether it[ ] . . . would be unconscionable as between the original parties to it."). Even *McInnis*, an authority cited by Ford, does not hold that a nonoriginal party to the contract is without standing to assert unconscionability. The Ohio Court of Appeals in *McInnis* stated "[w]e do not consider whether appellants could assert any unenforceability argument that the original parties may have had; appellants have not addressed that issue." 2009 WL 1419390, at *5.

### c. Equitable estoppel

Plaintiffs argue that Ford is equitably estopped from enforcing the warranty limitations because (1) Ford told Plaintiffs not to replace the spark plugs before 100,000 miles, even though Ford knew carbonization would affect the plugs beginning at least as early as 10,000 miles; (2)

(1:12-md-2316)

all of the plaintiffs relied on this misrepresentation; and (3) they all suffered harm as a result.

Because of Ford's pre-sale knowledge of the defects, its failure to disclose the defect to

Plaintiffs, and Ford's express misrepresentation in the Scheduled Maintenance Guide that the

plugs need not be replaced until 100,000 miles, Plaintiffs contend any time and mileage limits are

unconscionable.  Because of this, you have people like Plaintiff Ernestburg, who paid over

$3,000 to get his spark plugs repalced.

Ford argues that the express warranty period is not procedurally or substantively

unconscionable because Plaintiffs were experienced vehicle purchasers, many were owners or

operators of businesses, and the express warranty expanded rather than limited their rights.

*Stelluti v. Casapenn Enter., LLC*, 1 A.3d 678, 688 (N.J. 2010).  In *Ball v. Sony Electronics, Inc.*,

No. 05-C-307-S, 2005 WL 2406145 (W.D. Wis. Sept. 28, 2005), the court explained:

> Recognizing that the promise contained in the limited warranty has not been
> breached, plaintiffs seek to expand the express warranty by arguing that it . . . is
> unconscionable . . . .  [This] argument has [no] merit.  A remedial promise by a
> manufacturer to a remote purchaser does not displace the implied warranties that
> arose between the purchaser and his or her immediate seller, but is an additional
> benefit independent of the sales contract accruing to the purchaser as a matter of
> unilateral contract.  Such a promise is neither procedurally nor substantively
> unfair as required for unconscionability. . . .  Defendant's offer to repair or replace
> the product under the circumstances enhanced rather than limited plaintiffs'
> contractual rights and is therefore not unconscionable.

*Id.* at *6 (citations omitted).

The Court agrees with Plaintiffs that there are genuine issues of material fact in dispute

regarding whether Plaintiffs were highly experienced or sophisticated vehicle purchasers.

Accordingly, that question is better left for a jury to decide.

### 2. Scheduled Maintenance Guide

80

(1:12-md-2316)

Ford argues that summary judgment should be granted against all Plaintiffs on their express warranty claims based on the Scheduled Maintenance Guide, which accompanied every vehicle.  Plaintiffs contend that the Scheduled Maintenance Guide, in the face of a known defect, provided that people should not change their spark plugs until 100,000 miles, well after Ford knew that the defect was going to arise.

### a.  Whether Plaintiffs saw or read the Scheduled Maintenance Guide

The breach of express warranty count for the Ohio Plaintiffs alleges:

> When Ohio Plaintiffs and the members of the Sub-Class purchased and/or leased their Covered Vehicles (either as a new vehicle or as a used vehicle with remaining warranty coverage), Ford expressly warranted under its "Bumper to Bumper" warranty that it "will repair, replace, or adjust all parts on your vehicle that are defective in factory-supplied materials or workmanship."  Ford went on to promise that it would pay for all repairs and parts to replace defective parts, including the defective plugs.  Ford also expressly warranted that these spark plugs need not be replaced until 100,000 miles.

ECF No. 43 in Case No. 1:12-ds-35000 at ¶ 328.

An express warranty is created by a representation which becomes part of the basis of the bargain.  Ford argues that no warranty arose because no Plaintiff saw or read the representations in the Scheduled Maintenance Guide before purchasing their vehicle.  Therefore, representations in the Scheduled Maintenance Guide could not have become part of the basis of their bargain.

*Monte v. Toyota Motor Corp.*, Nos. 220671, 220983, 2001 WL 1152901 (Mich. App. Sept. 28, 2001); *Miller v. Showcase Homes, Inc.*, No. 98 C 2009, 1999 WL 199605 (N.D. Ill. March 31, 1999).

According to Plaintiffs, reliance is not required to establish that Ford violated the express written warranty based on the Scheduled Maintenance Guide.  Plaintiffs contend the majority of

81

(1:12-md-2316)

jurisdictions, including Florida, Illinois, Michigan, and Ohio, have abandoned reliance as a

required element of a written express warranty claim.  This is consistent with U.C.C. § 2-313

(adopted by all six summary judgment states) which provides that express warranties are created

by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the

goods and becomes part of the basis of the bargain. . . ."  Plaintiffs contend that Section 12 of the

Uniform Sales Act, which included an express reliance requirement, was replaced by Section

2-313 of the UCC which has no such requirement.  *Southern Broadcast Group, LLC v. Gem*

*Broadcasting, Inc.*, 145 F. Supp.2d 1316, 1324 (M.D. Fla. 2001) ("[T]his Court concludes that

the Florida Supreme Court would embrace the modern view that express warranties are

bargained-for terms of a contractual agreement, any breach of which is actionable

notwithstanding proof of non-reliance at the time of closing on the contract."), *aff'd*,  49 Fed.

Appx. 288 (11th Cir. 2002); *Norcold, Inc. v. Gateway Supply Co.*, 154 Ohio App.3d. 594, 601

(2003) (A decisive majority of courts that have considered this issue have reached the similar

conclusion that reliance is not an element in a claim for breach of an express written warranty.).[37]

---

[37]  According to *Kelleher v. Marvin Lumber & Cedar Co.*, 891 A.2d 477 (N.H. 2005):

> Section 2-313 does not define "part of the basis of the bargain."  The UCC is an adaptation of section 12 of the Uniform Sales Act (USA) and is basically the same except for the replacement of the USA's express reliance requirement with the UCC's "part of the basis of the bargain" requirement.  *Cipollone*, 893 F.2d at 565; *see* 1 J. White & R. Summers, Uniform Commercial Code § 9-5, at 448 (1995).  Consequently, section 2-313 omits any reference to reliance; instead, it requires only that the affirmation become "part of the basis of the bargain."  *Id.* at 449.  The extent to which the law has been changed to remove the reliance requirement is unclear.  *Id.*

*Id.* at 500.

(1:12-md-2316)

### b.  New Vehicle Limited Warranty

Ford argues that the New Vehicle Limited Warranty excluded all other warranties.

*Dicuio v. Brother Int'l Corp.*, No. 11-1447 (FLW), 2012 WL 3278917, at *10 (D.N.J. Aug. 9, 2012); *Norcold, Inc. v. Gateway Supply Co.*, No. 17-05-11, 2006 WL 3802609, at *10 (Ohio App. 3rd Dist. Dec. 28, 2006).

Plaintiffs respond that there are genuine issues of material fact as to whether the New Vehicle Limited Warranty expressly incorporates the Scheduled Maintenance Guide.  The New Vehicle Limited Warranty states, "Your glove compartment contains . . . a **Scheduled Maintenance Guide** which indicate[s] the scheduled maintenance required for your vehicle. . . . Failure to perform scheduled maintenance as specified in the Service Guide will invalidate warranty coverage. . . ." ECF No. 42-8 at PageID #: 856 (emphasis in original).  And the Scheduled Maintenance Guide sets forth maintenance intervals "based upon engineering testing to determine the most appropriate mileage to perform the various maintenance services" to "protect[ ] your vehicle at the lowest overall cost to you."  The Scheduled Maintenance Guide instructs that owners do "not deviate from the maintenance schedules presented in this . . . Guide." ECF No. 42-8 at PageID #: 1264.

### c.  Plaintiffs who had their spark plugs changed before 100,000 miles

Ford argues that its alleged breach caused no harm to Plaintiffs Anz, Engelman, Kmet, Kolinek, Pignato, Sondgerath, and Weisberg, who had their spark plugs changed well in advance of 100,000 miles. *Drayton v. Jiffee Chem. Corp.*, 591 F.2d 352, 361 (6th Cir. 1978); *Rasheed v. Church & Dwight Co.*, No. 5:11CV80, 2012 WL 262619, at *4 (E.D. Tex. Jan. 12, 2012).

(1:12-md-2316)

According to Plaintiffs, there are genuine issues of material fact as to whether Plaintiffs' spark plug replacement prior to 100,000 miles caused damage.  Anz, Engelman, Kmet, and Sondgerath followed recommendations to remove their spark plugs "early," Kolinek and Pignato had performance problems that necessitated changing the plugs before 100,000 miles and Weisberg changed the plugs early on his own accord, and all paid more to replace the spark plugs than they would have absent the defect.

### 3. Extended Warranties

Plaintiffs Anz, Engelman, Jennings, Kmet, Kolinek, Kogler, Precast Services, Pignato, Sondgerath, and Weisberg (including at least one from every bellwether state) each purchased or had transferred to them extended warranties (PremiumCARE Extended Service Plans) from Ford.  According to each of these ten Plaintiffs, they brought their vehicles in to an authorized Ford dealership within the time and mileage limits of the extended warranty, and each of them did not get coverage under the extended warranty—Ford denied every claim.  For example, Plaintiff Anz had a six-year/75,000 mile extended warranty.  He took his 2005 F-150 in to get the plugs replaced at 74,000 miles and well within the six-year time period.  Ford rejected his warranty claim, and he paid $800 to get the defective plugs out of his vehicle.  Plaintiff Kogler purchased a five-year/100,000 mile PremiumCARE Extended Service Plan.  The plugs in his vehicle were replaced at 94,418 miles, and within the five-year time period.  His extended warranty claim was also rejected by Ford.  Kogler had to pay $850.67 out of pocket.  ECF No. 41 at PageID #: 438-39.

(1:12-md-2316)

Ford did not move for summary judgment on the claims for breach of the extended warranties.[38] Ford's response to the extended warranties argument of these Plaintiffs is: "Plaintiffs rely on extended warranties purchased by some Plaintiffs, but the Master Amended Complaint states no claims based on an extended warranty. (*See* MCAC ¶¶ 313-314, 328-330, 526-528, 604-606, 727-729, 836-838, 1052-1054.)" ECF No. 57 at PageID #: 4595 n. 7. According to Ford, when Plaintiffs allege in ¶ 330 of the Master Consolidated Amended Complaint (ECF No. 43 in Case No. 1:12-ds-35000) that Ford breached its express warranties, they were referring to the New Vehicle Limited Warranty and the so-called warranty in the Maintenance Guide of 100,000 miles and not to the extended warranties, which simply appear in their extended statement of facts, which include lots of facts not necessarily relevant to any of their claims. ECF No. 72 at PageID #: 5032.

But, ¶ 18 of ECF No. 43 in Case No. 1:12-ds-35000 provides in pertinent part: "Even when a Covered Vehicle has remaining express warranty coverage, or has *Ford extended warranty coverage*, Ford refuses to cover these substantial additional costs, declaring that such expenses are merely routine maintenance. . . ." (Emphasis added.)[39] So, the Master Consolidated

---

[38] The Court required that the parties meet and confer to minimize claims for summary judgment. *See* ECF No. 31 at ¶ 4.B. So, the Court wonders why there is disagreement regarding whether the Master Consolidated Amended Complaint (ECF No. 43 in Case No. 1:12-ds-35000) contains claims for breach of the extended warranties.

[39] *See also* ¶¶ 136, 138, 248, and 250 of ECF No. 43 in Case No. 1:12-ds-35000.

(1:12-md-2316)

Amended Complaint does include claims for breach of extended warranties.[40]

### 4.  Plaintiffs who failed to give notice of breach as required by state law

Section 2-607(3) the Uniform Commercial Code, as adopted in Illinois, Texas, Ohio, and

Florida provides that "the buyer must within a reasonable time after he discovers or should

have discovered any breach notify the seller of breach or be barred from any remedy."  810 ILCS

5/2-607(3)(a); see also TEX. BUS. & COM.CODE § 2.607(c)(1); Ohio Rev. Code §

1302.65(C)(1);§ 672.607(3)(a), Fla. Stat.

Ford argues that summary judgment should be granted on all express warranty claims

against Plaintiffs who failed to give notice of breach as required by state law.  According to Ford,

Plaintiffs Engelman, Pignato, Debra and Larry Black, East Texas Poultry Supply, Jares, Kolinek,

Anz, Wall, Brewer, Buckeye Management Group, Kinch, Perko and Precast Services, Jennings,

Sondgerath, and Luke failed to give the notice of breach required by statute and judicial decision

in Illinois, Texas, Ohio, and Florida.  *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 590

(Ill. 1996); *U.S. Tire-Tech, Inc. v. Boeran, B.V.*, 110 S.W.3d 194, 198-99 (Tex. App. 2003); *St.*

*Clair v. Kroger Co.*, 581 F. Supp.2d 896, 902-903 (N.D. Ohio 2008) (Carr, CJ); *Jovine v. Abbott*

*Laboratories, Inc.*, 795 F. Supp.2d 1331, 1339-40 (S.D. Fla. 2011).

Plaintiffs argue that there are genuine issues of material fact as to whether notice was

sufficient, or even required, when Ford had actual knowledge of the defect, when Plaintiffs

---

[40]  Each breach of express warranty claim in ECF No. 43 in Case No. 1:12-ds-
35000 also realleges and incorporates by reference all of the extended warranty
allegations.  Thus, Ford had "fair notice" of the claims under the Sixth  Circuit's liberal
pleading standards. *Jacob v. Township of West Bloomfield*, 192 Fed.Appx. 330, 336 (6th
Cir. 2006) (citing *Allard v. Weitzman (In re DeLorean Motor Co.)*, 991 F.2d 1236, 1240
(6th Cir. 1993).

(1:12-md-2316)

provided specific notice to Ford and were told Ford would not remedy the defect, and when it

was known that Ford was denying such claims.  Furthermore, there are disputed genuine issues

of material fact as to whether some of these Plaintiffs provided Ford with adequate notice where

Engleman, Anz, Brewer, Debra and Larry Black, Jennings, Kolinek, Luke, Buckeye Management

Group, Pignato, and Perko and Precast complained to their dealer and/or requested warranty

coverage.  Anz, Jennings, Luke, and Kolinek all additionally called Ford corporate about their

spark plug issues.  ECF No. 68 at PageID #: 4960.

The Court finds that it is undisputed that Plaintiffs East Texas Poultry Supply, Jares,

Wall, Sondgerath, and Kinch failed to provide Ford with notice of an alleged breach of warranty,

as required by state law in Texas, Ohio, and Florida to pursue an express warranty claim.

### D.  New Jersey Plaintiffs Garber and Weisberg's Breach of Duty of Good Faith and Fair Dealing Claims

Ford argues that summary judgment is required against Plaintiffs Garber and Weisberg on

their good faith and fair dealing claims.

### 1.  Whether Plaintiffs Garber and Weisberg entered into a contract of sale

Ford argues that Plaintiffs Garber and Weisberg did not enter into a contract of sale with

Ford.  *Perkins v. Washington Mut., FSB*, 655 F. Supp.2d 463, 472 (D.N.J. 2009); *Martino v.*

*Everhome Mortg.*, 639 F. Supp.2d 484, 496 (D.N.J. 2009).

These Plaintiffs respond that genuine issues of material fact exist as to whether Plaintiffs

Weisberg and Garber had sufficient connection with Ford, including the existence of Ford's New

Vehicle Limited Warranty and Maintenance Guide, to assert good faith and fair dealing claims.

87

(1:12-md-2316)

Furthermore, according to these Plaintiffs, a genuine issue exists as to whether Weisberg's

purchase of an Extended Warranty directly from Ford gives rise to the claim.

### 2. Breach of the implied covenant

Next, Ford argues that Plaintiffs Garber and Weisberg cannot state a claim for breach of

the implied covenant based on any express warranties.  Ford contends that its alleged failure to

include certain terms in any express warranties cannot support a claim because the act of creating

a contract does not constitute breach of the implied covenant.  Also, Plaintiffs cannot prove

causation because they neither read nor relied on any warranties in purchasing their

vehicles.  *Scivoletti v. JP Morgan Chase Bank, N.A.*, No. 10-1778, 2010 WL 2652527, at *7

(D.N.J. June 25, 2010); *Wade v. Kessler Inst.*, 778 A.2d 580, 589-90 (N.J. Super. Ct. App. Div.

2001).

These New Jersey Plaintiffs argue that a genuine issue of material fact exists as to

whether their good faith and fair dealing claims may be based on Ford's knowing failure to

disclose the defect prior to the sale and warranting of the vehicles, as well as Ford's failure to

correct the information it gave to them about changing the spark plugs at 100,000 miles.

### E.  Tort Claims of All Ohio Plaintiffs

Ford argues that summary judgment should be granted against all Ohio Plaintiffs on their

tort claims.

### 1.  Ohio Commercial Plaintiffs

Plaintiffs have withdrawn the tort claims of Plaintiffs Buckeye Management Group and

Precast Services.  *See* ECF No. 55-1 at PageID #: 4361 n. 80.

88

(1:12-md-2316)

## 2. Ohio Non-Commercial Plaintiffs

Ford argues that summary judgment should be granted against Plaintiffs Jennings,

Kinch, and Perko for two reasons.  First, their negligence and implied warranty in tort claims are

barred by the economic loss rule, which generally prevents recovery of purely economic damages

on the basis of negligence.  Second, there is no evidence that their vehicles were unfit for their

intended purpose or unmerchantable.

According to Ford, consumers who have the benefit of a manufacturer's express warranty

cannot maintain a claim under Ohio law for tortious breach of warranty against the manufacturer.

*See* *In re Ford Tailgate Litigation*, 2014 WL 1007066, at *5 (plaintiff was "entitled to the benefit

of Ford's express [New Vehicle Limited Warranty] and any implied warranties not explicitly

disclaimed therein" and therefore she was "not entitled to relief under this hybrid tort remedy,"

*i.e.*, a claim for tortious breach of warranty under Ohio law).  Plaintiffs respond that in citing *In*

*re Ford Tailgate Litigation*, Ford fails to confront the fact that its position is unsupported by

Ohio law.  *See* *Hartman v. Mercedes-Benz, U.S.A., L.L.C.*, No. 1:08CV03034, 2010 WL 907969,

at *7 (N.D. Ohio March 11, 2010) (White, MJ) (denying summary judgment after finding

insufficient support for car company's argument that the existence of a manufacturer's express

warranty bars a claim for breach of an implied warranty in tort ); *Risner v. Regal Marine Indus.,*

*Inc.*, No. 1:11-cv-00191, 2013 WL 1758876, at *15 (S.D. Ohio April 24, 2013) (same).  *See also*

*Johnson v. Monsanto Co.*, No. 11-02-02, 2002 WL 2030889, at *1, 6 (Ohio App. 3rd Dist. Sept.

6, 2002) (allowing plaintiffs to proceed on both express warranty in contract and implied

warranty in tort claims); *Hale v. Enerco Grp., Inc.*, No. 1:10CV00867, 2011 WL 49545, at *6-7

89

(1:12-md-2316)

(N.D. Ohio Jan. 5, 2011) (Polster, J) (rejecting argument that plaintiffs, who had an express

warranty, could not bring common law negligent design and failure to warn claims seeking

recovery solely for economic losses).

In *Inglis v. American Motors Corp.*, 3 Ohio St.2d 132 (1965), the Ohio Supreme Court

held that a plaintiff cannot recover in negligence for purely economic losses allegedly caused by

a defective product when the only damage is to the product itself.  *Id.* at 140.  According to Ford,

*Inglis* is directly on point and controlling with respect to the negligence claims in the case at bar.

*See also In re Ford Tailgate Litigation*, 2014 WL 1007066, at *6 ("*Inglis* continues to be the rule

in Ohio").  Moreover, if the Ohio Supreme Court allowed tort claims like those asserted here to

proceed, it would stand virtually alone among American jurisdictions.  *Chemtrol Adhesives, Inc.*

*v. American Mfrs. Mut. Ins. Co.*, 42 Ohio St.3d 40 (1989) suggests it would not permit such

claims.

Plaintiffs respond that *Chemtrol* effectively overrules *Inglis*.  The Sixth Circuit recently

confirmed that *Chemtrol* accurately reflects Ohio law, holding that "Ohio law permits ordinary

consumers who are not in privity of contract with product manufacturers to bring claims such as

negligent design and negligent failure-to-warn in order to recover damages for economic injury

only."  *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 856 (6th

Cir. 2013).  Therefore, the Court declines to enter summary judgment in Ford's favor on

Plaintiffs Jennings, Kinch, and Perko's negligence and implied warranty in tort claims.

### 3.  Whether the Non-Commercial Plaintiffs' Vehicles Were Unfit for Their Intended Purpose or Unmerchantable

90

(1:12-md-2316)

Ford argues that summary judgment should be granted against Plaintiffs Jennings, Kinch, and Perko on their negligence and implied warranty in tort claims because there is no evidence that their vehicles and spark plugs were unfit for their intended purpose or unmerchantable.  Ford maintains, based upon the record in this case, that there is no genuine issue that these spark plugs performed as intended and were, in fact, merchantable for their entire useful life.

Plaintiffs agree that for purposes of the implied warranty in tort, a product is considered "defective" only if it "is not of good and merchantable quality, fit and safe for . . . (its) ordinary intended use."  ECF No. 55-1 at PageID #: 4363 (quoting *White v. DePuy, Inc.*, 129 Ohio App.3d 472, 480 (1998)).  For an implied warranty tort to lie, the Court would have to find that the automobiles with these spark plugs are not carrying the consumers from point A to point B in a safe and reliable manner.  According to Ford, the only evidence in this record is that they, in fact, did just that.  Ford maintains the cost of one maintenance item at 100,000 miles cannot render a vehicle unfit for its ordinary purpose of providing transportation.  *Suddreth v. Mercedes-Benz, LLC*, No. 10-CV-05130 (DMC-JAD), 2011 WL 5240965, at *5 (D.N.J. Oct. 31, 2011).[41]

These Ohio Plaintiffs drove their cars for six years with no problems.  They do not allege their spark plugs ever gave them a problem, that their vehicles were not safe or their vehicles were not reliable.  According to Ford, the only case Plaintiffs cite in this entire topic is *LaPuma v. Collinwood Concrete*, 75 Ohio St. 3d 64, 67 (1996) (holding that plaintiffs could maintain a

---

[41]  Ford also cites *Skelton v. General Motors Corp.*, 500 F. Supp. 1181, 1191-92 (N.D. Ill. 1980) in support of this argument.  The district court's order in *Skelton*, however, was reversed by the court of appeals.  *Skelton v. General Motors Corp.*, 660 F.2d 311 (7th Cir. 1981).

(1:12-md-2316)

cause of action for breach of implied warranty in tort based on contractor's use of concrete that

was the wrong color).  Ford distinguishes *LaPuma* from the case at bar.

> [I]f you don't get the paint color you want or if your paint chips, you are not
> getting the product you intended to get.  It's a completely distinguishable
> situation.

ECF No. 72 at PageID #: 4982.

Plaintiffs maintain that genuine issues of material fact exist which preclude summary

judgment on Plaintiffs Jennings, Kinch, and Perko's negligence and implied warranty in tort

claims, including whether the defect interferes with the use and enjoyment of the vehicle, when

these Plaintiffs paid up to $1,112.50 for spark plug replacement which took multiple days to

complete.

### 4.  Plaintiff Perko's Negligence Claim

Plaintiff Perko's 2006 Mustang GT is equipped with a 4.6L three-valve engine, and the

evidence shows that seized spark plugs have not been a significant issue on these engines.

Plaintiffs presented no evidence to the contrary.  *Newell Rubbermaid, Inc. v. Raymond Corp.*,

676 F.3d 521, 533 (6th Cir. 2012) (A plaintiff cannot simply sit back and highlight deficiencies

in the defendant's argument without providing some affirmative support for its own position.);

*Davis v. Cleveland Unlimited, Inc.*, No. 2:09CV1106, 2011 WL 1465600, at *4-5 (S.D. Ohio

April 18, 2011).

While Plaintiffs did not address this argument in ECF No. 55-1, they did summarily

respond in ECF No. 68.  They maintain that there is a genuine issue of material fact as to whether

Ford negligently designed Perko's 2006 Mustang GT, where the operative Technical Service

(1:12-md-2316)

Bulletin requires the 2006 4.6L Mustang GT engine to be subject to the same procedures as the 5.4L engines and the 4.6L engines utilize the same defective spark plugs as the 5.4L engines.

After review of the record, the Court finds that Ford is entitled to summary judgment on Perko's negligence claim because there is no evidence that Ford negligently designed Perko's Mustang GT.

### F.  Plaintiffs Who Cannot Show That They Have Suffered Any Loss

Ford argues that summary judgment should be granted against those Plaintiffs whom cannot show that they suffered any loss.

#### 1.  "Diminution in value"

Ford argues that Plaintiffs cannot show any "diminution in value" attributable to the cost of replacing one component out of thousands at 100,000 miles.

##### a.  Whether Plaintiffs can show "diminution in value" damages

Plaintiffs argue they are entitled to recover diminution in value damages, *i.e.*, "the difference between what a plaintiff paid for and what he or she received." ECF No. 55-1 at PageID #: 4366.  Ford's experts, David W. Harless, Ph.D. and George E. Hoffer, Ph.D., have examined resale values for Plaintiffs' vehicles with the allegedly defective plugs and compared them to resale values of comparable vehicles without the allegedly defective plugs.  As Professors Harless and Hoffer concluded, the depreciation patterns for Plaintiffs' vehicles show no abnormal or excessive depreciation compared to "non-defective" vehicles, demonstrating that buyers do not believe the alleged defect affects the value of the vehicle.  ECF No. 42-5 at PageID #: 610-12, 629-32, and Tables and Figures cited therein.

(1:12-md-2316)

Ford argues that none of the plaintiffs have presented evidence of any "diminution in value." *Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783, 794 (N.J. 2005); *Newell*, 676 F.3d at 533. Plaintiffs must suffer "an objectively ascertainable loss or damage," which could be measured by "expert proof of diminution of value" of the plaintiffs' property or "out-of-pocket expenses causally connected with the claimed defect perpetuated by defendant." *Thiedemann*, 872 A.2d at 789. "'[A] claim of loss in value must be supported by sufficient evidence to get to the factfinder. To raise a genuine dispute about such a fact, the plaintiff must proffer evidence of loss that is not hypothetical or illusory.'" *Perkins*, 890 A.2d at 1000 (quoting *Thiedemann*, *supra*, at 792).

Ford also argues that you need expert testimony in order to make a diminution claim under *Thiedemann*. Plaintiffs have R. Scott King as an expert, but notably, they did not have Mr. King opine on diminution in value. Plaintiffs, therefore, have no expert testimony for their diminution of value theory of damages. According to Ford, absent expert testimony, the law is clear, you do not have a diminution in value claim.

Plaintiffs respond that there is a genuine issue of material fact as to this issue because Plaintiffs have submitted evidence of diminution of value. There is evidence that Plaintiffs were specifically asked if the spark plugs had been changed in their vehicles; and Plaintiff Jennings was told by someone at a Ford dealership that trade-in value for his vehicle would be reduced by $1,000 if the spark plugs had not been replaced. ECF No. 48-61 at PageID #: 3940-41.

A party demonstrates that a fact is genuinely disputed by "citing to particular parts of materials in the record, including depositions, documents . . . affidavits or declarations . . .

94

(1:12-md-2316)

admissions, interrogatory answers," as well as other relevant materials.  Fed. R. Civ. P. 56(c)(1)(A).  According to Plaintiffs, they "provided specific evidence of diminution in value." (ECF No. 55-1 at PageID #: 4371)  If so, they fail to cite to the record.  Generalized assertions do not suffice, as a court has no "obligation to 'wade through' the record for specific facts" in support of a party's arguments.  United States v. WRW Corp., 986 F.2d 138, 143 (6th Cir. 1993) (citing InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990)).

Accordingly, the Court will grant summary judgment in favor of Ford on Plaintiffs' diminution of value theory of damages.

### b.  Plaintiffs who sold or traded in their vehicles

Ford argues that Plaintiffs Luke, Garber, Weisberg, East Texas Poultry Supply, and Brewer, who sold or traded in their vehicles, cannot show damages resulting from "diminution in value."  Plaintiffs did not respond to this argument in their Amended Memorandum in Opposition (ECF No. 55-1).  Plaintiffs did respond in the parties' Joint Certificate (ECF No. 69) that they are not asserting that there is specific evidence of diminution in value for Plaintiffs Luke, Garber, Weisberg or East Texas Poultry Supply.  Id. at PageID #: 4968.  Plaintiffs maintain, however, that they have presented evidence of diminution of value as to Plaintiff Brewer in ECF No. 68.[42]  ECF No. 69 at PageID #: 4968.

---

[42]  Brewer testified that he believed his 2006 F-150 "was worth somewhere around 9,000, 9,000 to 10,000," but he received $7,500 for trade in.  ECF No. 42-13 at PageID #: 1525-26.

95

(1:12-md-2316)

After review of the record, the Court finds that Ford is entitled to summary judgment on the "diminution in value" claims of Plaintiffs Luke, Garber, Weisberg, and East Texas Poultry Supply because these Plaintiffs presented no evidence that the alleged defect made any difference in the prices they received when they sold or traded in their vehicles. *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 859 (Ill. 2005); *see also Thiedemann*, 872 A.2d at 794.

### 2. Whether Plaintiffs can show that they paid "excessive monies" for spark plug replacements

All Plaintiffs (except Perko) incurred out-of-pocket expenses to replace spark plugs in some of their vehicles. Ford argues that Plaintiffs cannot show that they paid "excessive monies" for spark plug replacements (albeit for differing reasons). *Hoffer v. Cooper Wiring Devices, Inc.*, No. 1:06CV763, 2007 WL 1725317, at *6 (N.D. Ohio June 13, 2007); *Thiedemann*, 872 A.2d at 794.

#### a. Plaintiffs Perko and Precast Services (Vehicles 79, 81, and 90)

According to Ford, these Plaintiffs had no out-of-pocket expenses. *See*, *e.g.*, *Hoffer*, 2007 WL 1725317, at *6.

Plaintiffs respond that they have been damaged and are entitled to recovery at law even if they have not yet incurred out-of-pocket expenses to replace the spark plugs. *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838 at 856-58; *Arales v. Furs by Weiss, Inc.*, No. 81603, 2003 WL 21469131 (Ohio App. 8th Dist. June 26, 2003).

Plaintiffs argue that there is a genuine issue of material fact because Precast Services (Vehicle 90) had spark plugs replaced on April 13, 2011 for $564.72. As to Perko (Vehicles 79 and 81), regardless of whether their plugs have been replaced at an out-of-pocket cost, there is a

96

(1:12-md-2316)

genuine issue of material fact as to whether the plugs and the engine were defective at purchase.

Furthermore, although the warranties provide for free repairs, Plaintiffs are currently required to

pay for repairs which should have been covered by the New Vehicle Limited Warranty.  Thus,

there is a measurable difference between what they paid for and what they received and they have

been damaged.  Finally, when they replace the spark plugs, they will pay more than they would

have absent the defect.

### b.  Plaintiffs Precast Services (Vehicles 83, 87, 88, 91, and 92), Kinch, Engelman, and Kolinek

These Plaintiffs paid $280 or less to replace eight plugs, or the comparable per-plug labor

cost.  According to Ford, these out-of-pocket costs are well within the range of typical

replacement costs for traditional plugs on comparable vehicles.

According to Plaintiffs, among other evidence, testimony of Ford's own employees,[43] as

well as Ford's own documents, create a genuine issue of material fact as to whether Plaintiffs

paid more to replace their spark plugs than they would have absent the defect.  Ford is

intentionally framing the issue in a way that ignores the proper measure of damages and also is

attempting to ignore part costs and other costs, and only "crediting" purported labor costs as

damages.  Ford has no legal authority to support its self-serving construct.  The amounts

Plaintiffs paid exceeded their reasonable expectations.  Plaintiffs Precast Services (Vehicles 83,

87, 88, 91, 92), Kinch, Engelman and Kolinek paid significant amounts for spark plug repairs

and did not expect to receive a vehicle with a known defect.  A proper measure of damages

---

[43] James Power, a designer of the high thread spark plug, testified that a spark plug change on the vehicles *should* cost a couple hundred dollars or less.  ECF No. 48-9 at PageID #: 3441 (emhasis added).

(1:12-md-2316)

includes not just labor costs, but also the difference between what a Plaintiff paid for and what they received.

### c.  Plaintiffs Precast Services (Vehicles 78 and 80), Kmet, Sondgerath, Pignato, Weisberg, and Debra and Larry Black

Ford argues that these Plaintiffs paid labor costs within the wide range of labor costs for the replacement of traditional plugs.

Plaintiffs respond that testimony of Ford's own employees, as well as Ford's own documents, create a genuine issue of material fact as to whether these Plaintiffs paid more to replace their spark plugs than they would have absent the defect.  Plaintiffs renew their criticism of how Ford frames the issue.  They rejoin that this false construct is designed to try to negate the substantial damages and costs incurred by these Plaintiffs.  The amounts Plaintiffs Precast Services (Vehicles 78, 80), Kmet, Sondgerath, Pignato, Weisberg, and Debra and Larry Black paid exceeded their reasonable expectations and were more than they would have been absent the defect.

### d.  Plaintiffs Buckeye Management Group, Jennings, Kogler, Garber, Ernestburg, East Texas Poultry Supply, Jares, Luke, Anz, Wall, Brewer, and Precast Services (Vehicle 62)

Ford argues that these Plaintiffs have presented no evidence that the mechanics whom replaced the spark plugs on their vehicles used proper tools or techniques.

Plaintiffs Ernestburg and Jares paid $3,100.82 and $2,619.81, respectively to remove the spark plugs from their vehicles.  ECF No. 42-17 at PageID #: 1800-1802; ECF No. 42-19 at

(1:12-md-2316)

PageID #: 1958.[44]  Plaintiffs argue that a genuine issue of material fact exists as to whether, in the

face of the defect, the costs imposed on consumers as a result of the defect (regardless of the tool

and techniques utilized), and the manner in which Ford elected to disseminate notice of the

defect (including, but not limited to the Technical Service Bulletins), Ford can absolve itself of

liability by requiring proof that proper tools or techniques were utilized.

### 3.  Whether Plaintiffs can show that they paid "excessive monies" for maintenance and repair

Ford's final argument is that summary judgment should be granted because Plaintiffs

have not shown that their "**overall** costs of maintenance and repair" were excessive.  Ford admits

that it is aware of no authority that directly supports this argument in any of the relevant states.

ECF No. 57 at PageID #: 4607.  Ford argues that most Plaintiffs have presented no evidence that

they paid "excessive monies" for maintenance and repair.  *Hoffer v. Cooper Wiring Devices, Inc.*,

No. 1:06CV763, 2007 WL 1725317, at *6 (N.D. Ohio June 13, 2007); *Thiedemann*, 872 A.2d at

794.

According to Plaintiffs, Ford's self-serving construct is not the proper measure of

damages.  Testimony of Ford's own employees, and Ford's own documents, create a genuine

issue of material fact as to whether the Plaintiffs paid more to replace the spark plugs than they

would have absent the defect.  Furthermore, there is no legal or factual basis that supports Ford's

argument that Plaintiffs' claims fail because they did not present evidence that the "overall costs

of maintenance and repair" of the vehicles as a whole were excessive.  This is not the legal

---

[44]  Plaintiff Ernestburg's F-150 was in the shop at Chapman Ford for 12 days.
ECF No. 42-17 at PageID #: 1802.  Sevcik's had Plaintiff Jares' F-150 for four days,
during which time he had to rent a car.  ECF No. 42-19 at PageID #: 1958.

(1:12-md-2316)

standard for materiality and/or damages (or ascertainable loss), nor is any such showing required to prevail on any of their claims.

The Court will not enter summary judgment in favor of Ford when it cites no legal or factual basis that directly supports its final argument.

## V.  Conclusion

Viewing Plaintiffs' probative evidence and all reasonable inferences drawn therefrom in the light most favorable to Plaintiffs, Ford's Motion for Summary Judgment (ECF No. 42) is granted in part and denied in part.

Accordingly:

To the extent a claim has been made, summary judgment is granted in favor of Ford on the statutory fraud claim of all Plaintiffs based on an affirmative misrepresentation by Ford.

Summary judgment is granted in favor of Ford on all express warranty claims of Plaintiffs East Texas Poultry Supply, Jares, Wall, Sondgerath, and Kinch because they failed to give notice of breach as required by statute and judicial decision in Texas, Ohio, and Florida.

Because Plaintiffs Anz, Brewer, Ernestburg, and Kinch do not have standing to claim that the express warranty period is unconscionable when they purchased their vehicles used and were not parties to the contract with Ford, summary judgment is granted in favor of Ford.

The negligence and implied warranty in tort claims of Plaintiffs Buckeye Management Group and Precast Services are withdrawn.

The Court grants summary judgment in favor of Ford on Plaintiffs' diminution of value theory of damages.

100

(1:12-md-2316)

Summary judgment is granted in favor of Ford on Perko's negligence claim.

Finally, summary judgment is granted in favor of Ford on the "diminution in value"

claims of Plaintiffs Luke, Garber, Weisberg, and East Texas Poultry Supply.

Summary judgment is denied as to all other claims.


IT IS SO ORDERED.


 July 30, 2014                              /s/ Benita Y. Pearson
Date                                       Benita Y. Pearson
                                           United States District Judge

101